UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__7/2/2021__

JAMES SAVARESE,

               Plaintiff,

       -v-

CITY OF NEW YORK, et al.,

            Defendants.

------------------------------------------------------------------------X

18-cv-5956 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. For the following reasons, the motion is granted.

## BACKGROUND

The case grows out of an incident on July 1, 2015, which resulted in the arrest of Plaintiff James Savarese ("Savarese" or "Plaintiff") and of one other person. Traffic Agent ("T.A.") Mohammad Islam ("T.A. Islam") was on duty, wearing his uniform and patrolling the 100th precinct in the Rockaways area of Queens, New York. Dkt. No. 102 ¶¶ 1-3, 5. He was assigned a New York City Police Department ("NYPD") vehicle, and his job as a T.A. involved issuing summons for traffic violations. *Id*. ¶¶ 4-5. At the time, T.A. Islam was patrolling and issuing summons for traffic violations. *Id*. ¶ 6.

At approximately 3:15 p.m. that day, he had a confrontation at Beach 129th Street and Cronston Avenue with a retired New York City Fire Department ("NYFD") firefighter named Shaun Reen ("Reen"), who is not a party to this case. Dkt. No. 90 ¶ 9. Reen, who had a bicycle with him and was emerging from a pharmacy, noticed T.A. Islam's NYPD traffic vehicle parked in the vicinity of a fire hydrant, approached T.A. Islam, and asked him why he was parked on a

hydrant. *Id*. ¶¶ 8, 10-11; Dkt. No. 102 ¶ 9.[1]  Reen also asked T.A. Islam to have T.A. Islam's supervisor respond to the scene.  Dkt. No. 102 ¶ 26.  T.A. Islam claims that during the confrontation he attempted to get in his car but that Reen grabbed his wrist or arm and told him he could not go.  *Id*. ¶ 23.  Reen claims that T.A. Islam shouted either "you're assaulting me" or "assault."  *Id*. ¶ 25.  T.A. Islam then went inside his traffic vehicle.  *Id*. ¶ 28.

Plaintiff is an acquaintance of Reen and, at the time, was an active duty firefighter with the NYFD.  *Id*. ¶¶ 33-34.  He arrived at the scene by car coincidentally as Reen was confronting T.A. Islam and asked Reen what was occurring between him and T.A. Islam.  *Id*. ¶ 33.  Reen asked Plaintiff to pull over and said something to Plaintiff about T.A. Islam being parked on the hydrant and having accused Reen of assault.  *Id*. ¶ 38.  Plaintiff parked his vehicle and walked over to Reen and T.A. Islam.  *Id*. ¶ 39.  Reen told Plaintiff that T.A. Islam was on the hydrant and they had been arguing over it, and Plaintiff responded that Reen should not "waste his time, and that traffic agents often park on the hydrant."  *Id*. ¶ 43.  Reen also informed Plaintiff that he had wanted a supervisor at the scene and that his sister had also called the police to respond to the scene.  *Id*. ¶¶ 48-49.

At the time Plaintiff arrived at the scene, Lieutenant Ryan McNamara ("McNamara") of the FDNY also appeared; Plaintiff told McNamara that T.A. Islam was parked on a hydrant, McNamara told T.A. Islam that he could not park on a hydrant, T.A. Islam responded that he did not have to listen to McNamara, and Reen asked McNamara to summon the police by calling 911.  *Id*. ¶¶ 52, 54, 58-59, 60.

---

[1] The parties use "on a hydrant" as vernacular for parking in the space in front of a fire hydrant.

Plaintiff then told T.A. Islam directly that he could not park on a hydrant. *Id.* ¶ 50. At one point, he also went behind T.A. Islam's vehicle to take approximately two or three pictures of T.A. Islam's car parked in front of the hydrant. *Id.* ¶¶ 64-65.

The confrontation that is at the center of this lawsuit then ensued. In brief, T.A. Islam claims that Plaintiff and Reen obstructed him from driving his vehicle. Plaintiff denies obstructing T.A. Islam. Both T.A. Islam and Plaintiff took photographs. T.A. Islam took a photograph of Plaintiff and Reen that he claims show them obstructing him. The photograph taken by T.A. Islam shows Reen leaning on his bike directly in front of T.A. Islam's vehicle while Plaintiff is around 2-3 feet away from the rear of the traffic vehicle. Dkt. No. 92-5. Plaintiff took a photograph of T.A. Islam to document T.A. Islam's violation of rules regarding parking next to a hydrant. Plaintiff claims that T.A. Islam backed his car up toward Plaintiff in retaliation.

It is undisputed, however, that after T.A. Islam took his photograph, T.A. Islam contacted the "Citywide system" and his supervisor to indicate that he was being obstructed from continuing to perform his job. Dkt. No. 102 ¶ 80; Dkt. No. 100-11.

At some point thereafter, Officers and Defendants William Grieshaber ("Officer Grieshaber") and Michael Fransson ("Officer Fransson") of the NYPD arrived at the scene. Dkt. No. 102 ¶ 86. Officer Grieshaber testified that when he arrived on the scene, he observed Reen in front of the traffic vehicle, Savarese behind the traffic vehicle, and T.A. Islam inside the traffic vehicle.[2] The officers spoke to Reen, T.A. Islam, and Plaintiff separately, each of whom told their side of the story to the officers. *Id.* ¶ 91. Reen explained his version of events to the police officers, including that he wanted a supervisor at the scene to report the traffic vehicle on the

_____

[2] Plaintiff disputes this and identifies contrary testimony in the record. *See id.* ¶ 87.

hydrant. *Id.* ¶ 95. T.A. Islam told the officers that Reen had blocked his vehicle by standing in front of it and that Plaintiff had blocked his vehicle by standing behind it and that Reen had grabbed him. *Id.* ¶¶ 99-100, 102-03. T.A. Islam also told the officers that he had asked Plaintiff and Reen to move and that Reen and Plaintiff refused to move and refused to let him leave. *Id.* ¶¶ 104-05. Plaintiff told the officers that he had been behind the vehicle only briefly, to take two or three pictures or so, and denied that he blocked Islam from leaving. Dkt. No. 90 ¶¶ 37-38. Plaintiff told the officers what he saw, which included seeing the traffic vehicle on the fire hydrant and that Reen and T.A. Islam were in a discussion about the alleged assault, and about an allegation by T.A. Islam that Reen had scratched T.A. Islam's vehicle with the handlebars of Reen's bicycle. Dkt. No. 102 ¶ 107. The officers told Reen that they were not going to arrest Reen and Plaintiff until they were directed to do so by a superior officer. *Id.* ¶ 110.

After the police officers had spoken to Plaintiff and T.A. Islam, Sergeant Keith Burkitt ("Sgt. Burkitt") of the NYPD, who was the officers' supervisor, arrived at the scene. *Id.* ¶ 112.

Sgt. Burkitt testified that when he arrived at the scene, he observed Reen in the front left driving side part of the traffic vehicle, either on his bicycle or standing beside his bicycle. Dkt. No. 92-7 at 36:22-37:14. Sgt. Burkitt also testified that he observed Plaintiff in the rear of the traffic vehicle, *id.* at 39:7-12, but that testimony is disputed by Plaintiff in a declaration opposing summary judgment, which states that Plaintiff was standing on the sidewalk and was not at the time positioned in a manner where he was impeding the movement of T.A. Islam's car. Dkt. No. 101 ¶ 36.

Sometime after Sgt. Burkitt, Officer Grieshaber, and Officer Fransson arrived on the scene, Plaintiff's supervisor Debra Youmans ("Youmans") also arrived. Dkt. No. 102 ¶ 129. Youmans spoke with T.A. Islam and with the officers on the scene. *Id.* ¶¶ 130-133. Reen

testified that the police officers told him that Youmans wanted the officers to arrest Plaintiff and Reen, but that the officers told Reen that they would not arrest Plaintiff and Reen unless and until they were instructed to do so by their own supervisor. Dkt. No. 92 at 71:19-24.[3]

Sgt. Burkitt conferred with the police officers who informed him what they had been told by T.A. Islam, Plaintiff, and Reen. Dkt. No. 102 ¶ 116. Plaintiff, Reen, and T.A. Islam relayed their respective version of events to Sgt. Burkitt. Dkt. No. 90 ¶¶ 41, 44; Dkt. No. 102 ¶117. T.A. Islam told Sgt. Burkitt the same story about what had happened and that he had been issuing summons on the street when Reen confronted him about being parked next to a fire hydrant and giving out summons while blocking the hydrant. Dkt. No. 102 ¶¶118-19. He also told Sgt. Burkitt that Reen had grabbed him and that Reen and Plaintiff blocked T.A. Islam's vehicle and prevented it from leaving. Dkt. No. 102 ¶¶ 120-21, 123. Reen told Sgt. Burkitt that T.A. Islam had parked either on or in the immediate vicinity of a fire hydrant and that he wanted a supervisor to observe T.A. Islam's vehicle in the act. Dkt. No. 90 ¶ 45. Plaintiff told his version of the story and also informed Sgt. Burkitt that he was an active duty NYFD firefighter. *Id.* ¶ 46.

After Sgt. Burkitt's conversations with Reen, Plaintiff, and T.A. Islam, Reen and Plaintiff were informed that they were going to be placed under arrest. *Id.* ¶ 54. Plaintiff was told he could call his job to tell them that he was not coming to work that night but that he was not free to leave. He and Reen were placed in a police vehicle and taken to the 100th precinct by Officers Grieshaber and Fransson. *Id.* ¶¶ 56-60; Dkt. No. 102 ¶ 144. Neither Plaintiff nor Reen were handcuffed at that point. Dkt. No. 90 ¶ 55; Dkt. No. 102 ¶ 145.

---

[3] For purposes of this motion, Defendants do not challenge Reen's testimony as hearsay, and in any event, its inclusion does not affect disposition of the motion.

At the precinct, T.A. Islam spoke to Captain Mahoney of the NYPD (also a defendant) and told him that Reen and Plaintiff had obstructed him in front of and from behind his car respectively, that Plaintiff refused to let him leave, and that Reen had refused to let him leave and had grabbed him. Dkt. No. 90 ¶¶ 62-65. T.A. Islam also told Captain Mahoney that he had asked Reen and Plaintiff to move and that they had refused to do so. *Id.* ¶ 66.

Plaintiff and Reen also spoke to Captain Mahoney. Reen gave his version of events to Captain Mahoney. *Id.* ¶ 72. Captain Mahoney asked Plaintiff what had happened, and Plaintiff responded that all that Plaintiff had done was to go behind T.A. Islam's car and take a couple of photographs. *Id.* ¶ 74. Captain Mahoney informed Reen and Plaintiff that they were being arrested for obstructing government administration. Dkt. No. 102 ¶ 165.

Plaintiff was processed at the precinct, and he and Reen were booked and placed in a cell. Dkt. No. 90 ¶¶ 76-77. After an hour or two in the cell at the precinct, Plaintiff and Reen were taken to the Queens Central Booking Facility in handcuffs. *Id.* ¶ 79. Plaintiff went through the processing at Queens Central Booking, including having his handcuffs removed, fingerprinting, and a retina scan, and he was moved to various jail cells within Queens Central Booking. *Id.* ¶¶ 81-82; Dkt. No. 102 ¶¶ 169-70.

Plaintiff appeared at his arraignment the following day with a union lawyer. Dkt. No. 90 ¶ 85. He was presented on a complaint sworn the previous day (July 1, 2015 by Officer Grieshaber) charging him with Obstruction of Governmental Administration in the Second Degree ("OGA") in violation of N.Y. Penal Law § 195.05, based on what T.A. Islam had informed the officer, and Plaintiff was offered an adjournment in contemplation of dismissal ("ACD"). *Id.* ¶¶ 96, 88-90. The criminal complaint reflected:

> Deponent states that he is informed by Traffic Agent Mohammad Islam, Shield Number 3723, that on the above mentioned date, time, and place of occurrence,

after issuing a vehicle a summons, he entered his New York Police Department traffic vehicle and observed [Reen] standing in the front of the vehicle and defendant, James Savarese, standing in the rear of the vehicle. Defendant is further informed by Traffic Agent Islam that when he asked the defendants to please move they refuse to move. Deponent is further informed by Traffic Agent Mohammad Islam that he observed defendant Savarese with his phone is [sic] hand behind the vehicle.

Dkt. No. 92-24.

Plaintiff turned down the ACD. Dkt. No. 90 ¶ 86.

On September 2, 2015, Officer Grieshaber signed a second updated criminal court complaint which also charged Plaintiff with OGA in the Second Degree. *Id.* ¶¶ 91-92 ("Criminal Court Complaint"). The second criminal court complaint had more detail than the first complaint but also was based exclusively on T.A. Islam's statements to Officer Grieshaber. It recited that T.A. Islam had stated that Reen and Plaintiff had impeded his ability to move his NYPD vehicle by Reen standing in front of the vehicle and Plaintiff standing at the rear of the vehicle and that Reen and the Plaintiff had refused his directive to move. Dkt. No. 92-25. It also recited that Reen and Plaintiff had blocked his vehicle from moving for approximately 15 minutes and that Reen had grabbed T.A. Islam when Islam exited his vehicle and stated, in sum and substance, "I want to talk to you, you can't park here, why do you always come to this area to issue summons." *Id.* T.A. Islam also had told the officer that Plaintiff and Reen were taking pictures of his vehicle. *Id.* T.A. Islam signed a sworn statement that the facts stated in the complaint were true. Dkt. No. 92-26; Dkt. No. 90 ¶ 97. T.A. Islam also met with a representative from the District Attorney's Office and told the representative that he had asked Plaintiff and Reen to move and that they had refused to do so. Dkt. No. 90 ¶ 95.

On Plaintiff's next court date, September 10, 2020, Plaintiff accepted an ACD. *Id.* ¶ 98; Dkt. No. 102 ¶ 174. On March 9, 2016, Plaintiff's criminal matter was fully dismissed pursuant

to the ACD.  Dkt. No. 90 ¶ 99.  After Plaintiff's arrest and prosecution, he never saw any of the

Defendants in this case again.  Dkt. No. 102 ¶ 205.

## PROCEDURAL HISTORY

Savarese filed his complaint on June 30, 2018.  Dkt. No. 1.

On February 19, 2021, Defendants made their motion for summary judgment.  Dkt. No.

89.  Plaintiff filed a memorandum of law in opposition to the motion for summary judgment on

April 19, 2021.  Dkt. No. 104.  On May 28, 2021, Defendants filed a reply memorandum of law

in further support of the motion for summary judgment.  Dkt. No. 107.  The court heard oral

argument on June 16, 2021.  After oral argument, each side submitted post-argument letters.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the moving party is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"  *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008),

and the movant bears the burden of demonstrating that "no genuine issue of material fact exists,"

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).  "[A] party may

not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Nor may the non-moving party "rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010).

Rather, to survive a summary judgment motion, the non-moving party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). It "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. Of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted), but rather must demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 247-48. The nonmoving party must set forth "concrete particulars" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Rsch. Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Moreover, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## DISCUSSION

As originally pleaded, the Complaint asserted three claims. The first claim is for deprivation of rights under the United States Constitution and 42 U.S.C. § 1983 ("Section 1983"). Plaintiff asserted that Defendants violated the Constitution:

[b]y their conduct and actions in seizing plaintiff, falsely arresting and imprisoning plaintiff, trespassing upon plaintiff, abusing process against plaintiff, violating rights to due process of plaintiff, fabricating evidence against plaintiff, unreasonably prolonging plaintiff's time in custody, subjecting Plaintiff to unduly harsh conditions of confinement, violating and retaliating for plaintiff's exercise of his rights to free speech and assembly (including but not limited to taking photographs to document misconduct by a member of the NYPD), failing to intercede on behalf of the plaintiff and in failing to protect the plaintiff from the unjustified and unconstitutional treatment he received at the hands of other defendants, and by conspiring against Plaintiff.

Dkt. No. 1 ¶ 103.

Plaintiff alleged that Defendants' conduct violated the First, Fourth, and Fourteenth Amendments to the Constitution. *Id*. ¶ 103. In the second claim, Plaintiff alleges that T.A. Islam, Sgt. Burkitt, Captain Mahoney, and Youman violated his constitutional rights "[b]y their conduct in failing to remedy the wrongs committed by their subordinates and in failing to properly train, supervise, or discipline their subordinates." *Id*. ¶ 106. The third claim is a *Monell* claim against the City of New York for "de facto policies, practices, customs and usages which were a direct and proximate cause of the unconstitutional conduct" alleged elsewhere in the Complaint. *Id*. ¶ 109.

In his opposition memorandum, Plaintiff abandons his conditions of confinement claim and his claim for supervisory liability under its second claim for relief, arguing that he asserts individual liability as participants against the Defendants named in the second claim. Dkt. No. 104. Plaintiffs offer no facts in support of his claims for abuse of process. At argument, Plaintiff clarified that he did not have an independent claim for "trespass" and "violating rights to due process"; those claims are redundant of his false arrest claims. *See* Hr'g Tr. 33:20-34:2 (June 16, 2021).

Defendants argue that they are entitled to summary judgment (1) on the false arrest claim because the officers had probable cause to arrest Plaintiff and, in any event, are entitled to

qualified immunity; (2) on the First Amendment claim because the existence of probable cause

bars the retaliatory arrest claim; (3) on the fabrication of evidence claim based on Plaintiff's

acceptance of the ACD; and (4) on the claims for prolonging Plaintiff's arrest and failure to

intervene for failure to identify genuine issues of fact that Plaintiff's constitutional rights were

violated.  Defendants also argue that Plaintiff has not identified triable issues of fact on the

claims against the supervisors and on the *Monell* claim.

### A.    False Arrest Claim

"In order to maintain a section 1983 action, two essential elements must be present:

(1) the conduct complained of must have been committed by a person acting under color of state

law; and (2) the conduct complained of must have deprived a person of rights, privileges, or

immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d

545, 547 (2d Cir. 1994) (citations omitted).  A Section 1983 claim for false arrests "rest[s] on the

Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest

without probable cause."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  The substantive

elements of a false arrest claim under Section 1983 are "substantially the same as [for] a claim

for false arrest under New York law." *Id*.  To establish a claim for false arrest and

imprisonment, a plaintiff must prove: "(1) the defendant intended to confine plaintiff; (2)

plaintiff was conscious of the confinement; (3) did not consent to such confinement; and (4) the

confinement was not otherwise privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir.

2003).

Confinement is privileged, and a complete defense exists to a claim for false arrest and

imprisonment when it is supported by probable cause.  *Weyant*, 101 F.3d at 852; *see Banyan v.

Sikorski*, 2021 WL 1163653, at *5 (S.D.N.Y. Mar. 26, 2021), *reconsideration denied sub nom.*,

2021 WL 2156226 (S.D.N.Y. May 27, 2021) ("The existence of probable cause to arrest

constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.") (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)).  "Probable cause to arrest exists when [police] officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007).  Whether probable cause exists is analyzed by examining the facts known to the arresting officer at the time of the arrest.  *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).

Where a defendant asserts the defense of qualified immunity, the standard is even more relaxed.  An officer has immunity from a Section 1983 false arrest claim when she has "arguable probable cause." *Cerrone v. Brown*, 246 F.3d 194, 202 (2d Cir. 2001).  "Arguable probable cause exists when 'a reasonable police officer in the same circumstances and possessing the same knowledge was the officer in question could have reasonably believed that probable cause existed in light of well established law.'" *Id*. at 202-03 (quoting *Lee v. Sandberg*, 136 F.3d 94, 102 (2d Cir. 1997)).  "The essential inquiry in determining whether qualified immunity is available to an officer accused of false arrest is whether it was objectively reasonable for the officer to conclude that probable cause existed." *Jenkins*, 478 F.3d at 88 (an officer has qualified immunity against a claim of false arrest when "officers of reasonable competence could disagree on whether the probable cause test was met") (quoting *Lennon v. Miller*, 66 F.3d 416, 423-24 (2d Cir. 1995)); *see Nigro v. City of New York*, 2020 WL 5503539, at *2 (S.D.N.Y. Sept. 11, 2020); *Grytsyk v. Morales*, 2021 WL 1105368, at *3-4 (S.D.N.Y. Mar. 22, 2021).

Plaintiff was arrested on a charge of OGA in the second degree pursuant to N.Y. Penal Law § 195.05.  Under that statute, "[a] person is guilty of obstructing governmental

administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference." N.Y. Penal Law § 195.05.

"The crime of 'obstructing governmental administration requires as an element of the crime that the accused act by one of three methods: (1) intimidation, (2) physical force or interference, or (3) any independently unlawful act.'" *Uzoukwu v. City of New York*, 805 F.3d 409, 414 (2d Cir. 2015) (quoting *People v. Case*, 396 N.Y.S.2d 841, 844 (1977)) (internal quotation marks and citations omitted); *see Dancy v. McGinley*, 843 F.3d 93, 11 (2d Cir. 2016) (same). "It is axiomatic that 'only physical interference . . . is encompassed in the [interference] method of obstruction." *Uzoukwu*, 805 F.3d at 414*; see In re Davan L.*, 666 N.Y.S.2d 1015, 1016 (1997) ("[T]he interference would have to be, in part at least, physical in nature.") (quoting *Case*, 396 N.Y.S.2d at 844). However, "actionable 'interference can consist of inappropriate and disruptive conduct at the scene of the performance of an official function even if there is no physical force involved." *Antic v. City of New York*, 740 F. App'x 203 (2d Cir. 2018) (quoting *Kass v. City of New York*, 864 F.3d 200, 209-10 (2d Cir. 2017)).

**1.    Summary judgment is granted on false arrest claim against Officers Grieshaber and Fransson and Sgt. Burkitt**

In a case that can be considered a parallel to this one, involving a similar factual record, Judge Brodie granted summary judgment to the same defendants on the claim by Reen that they arrested him without probable cause. *See Reen v. City of New York*, 2018 WL 4608194 (Sept. 25, 2018). Judge Brodie held that the officers had probable cause to arrest Reen based on the undisputed facts regarding "their observations on the scene and T.A. Islam's account of the incident." *Id*. at *8. The court noted that "[a]t different points, T.A. Islam informed Officer

Grieshaber, Sgt. Burkitt, and Captain Mahoney that Plaintiff and Savarese 'were not allowing him to move,' and that [Reen] had grabbed him, refused to let him leave, and had blocked him for approximately fifteen minutes by standing 'in front of the vehicle with his bicycle blocking [T.A. Islam] from pulling out' while Savarese 'was in the rear of the vehicle.'" *Id*. at *7 (internal citations omitted). The court also relied on "Officer Grieshaber's own observation of [Reen] standing in front of T.A. Islam's vehicle." *Id*.

There are obvious differences between this case and *Reen*. For one, Plaintiff challenges the probable cause to arrest him; the existence of probable cause to arrest Reen for the same crime of which Plaintiff was accused does not itself establish probable cause to arrest Plaintiff. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person."). Second, the amount of information and its quality as to Plaintiff differs from that available to the arresting officers at the time as to Reen. In particular, although the evidence of what the arresting officers were told by T.A. Islam is identical, the officer's observations differ. It apparently was undisputed in *Reen* that Officer Grieshaber observed him standing in front of T.A. Islam's vehicle. There is a disputed fact here of whether Plaintiff was behind T.A. Islam's vehicle at the time he was observed by Officer Grieshaber.

However, the differences between this case and *Reen* and the factual disputes Plaintiff presents here are not material. It is undisputed here, as in *Reen*, that when the officers arrived, T.A. Islam exited his vehicle and approached Officer Grieshaber. Dkt. No. 102 ¶ 89. T.A. Islam appeared very upset and very frantic. *Id*. ¶ 90. T.A. Islam told Officer Grieshaber, Sgt. Burkitt, and Officer Fransson that Plaintiff and Reen blocked his vehicle and prevented him from leaving and discharging his duties as a T.A. by standing on each side of his vehicle—Reen in front of

and Plaintiff behind the vehicle.  *Id*. ¶¶ 99-100, 102-03.  T.A. Islam also told the first two officers on the scene as well as Sgt. Burkitt that he had asked Plaintiff and Reen to please move and that Reen and Plaintiff refused to move and refused to let him leave.  Dkt. No. 102 ¶¶ 104-05; Dkt. No. 90 ¶ 44.  T.A. Islam's statements were partially corroborated by Plaintiff's statement to the officers in response to their question regarding what had happened, and particularly by his partial admission that he had stood behind Islam's vehicle, albeit he claimed that he did so only briefly and did not block T.A. Islam from leaving.  Dkt. No. 90 ¶¶ 37, 39.  It was also supported by Officer Grieshaber's observations, when he arrived at the scene, that Reen was standing with his bicycle in the front of T.A. Islam's car and that, construing the evidence in the light most favorable to Plaintiff, Plaintiff was standing on the sidewalk not far from the car.

The arresting officers need not have seen Plaintiff and Reen in the middle of the criminal act in order to have probable cause to arrest Plaintiff.  *See Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) ("[I]nformation gleaned from informants can be sufficient to justify the existence of probable cause."); *Falls v. (Police Officer) Detective Michael Pitt*, 2021 WL 1164185, at *12 (S.D.N.Y. Mar. 26, 2021) (citing cases for proposition that police officers can make an arrest based on information from a 911 call); *Creighton v. City of New York*, 2017 WL 636415, at *26 (S.D.N.Y. Feb. 14, 2017) ("It is . . . 'well-established that a law enforcement official [may have] probable cause to arrest . . . [based on] information [the officer obtains] from some [other] person, normally the putative victim or eyewitness.'") (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)).  Nor need they have credited the statements of Reen and Plaintiff that they had not obstructed T.A. Islam and his vehicle over those of T.A. Islam himself who had been the victim of Plaintiff's actions and was in a position to tell the officers directly what had happened to him.  "[A] law enforcement official has probable cause to arrest if he received his

information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity." *Fabrikant v. French*, 691 F.3d 193, 216 (2d Cir. 2012) (quoting *Panetta*, 460 F.3d at 395)); *see also Falls*, 2021 WL 1164185, at *12 (same). The officers were not required to take the words of Plaintiff and Reen that Plaintiff had not committed the crime in the face of direct evidence from the victim himself.

Plaintiff argues that other bystanders at the scene would not have supported a criminal case against Plaintiff. In that form, he essentially seeks to litigate the question whether he engaged in OGA. Non-party Kim Green ("Green"), who was at the scene for a short period of time before the police arrived, observed the altercation among Plaintiff, Reen and T.A. Islam, but did not observe Plaintiff and Reen blocking T.A. Islam's car. Dkt. No. 106 ¶¶ 290-295. Non-party Eileen Anderson ("Anderson"), who is Reen's sister, came to the scene because she was called by Green who said that Reen was having words with a traffic agent. She testified that when she arrived both Plaintiff and Reen were standing on the sidewalk. She also overheard T.A. Islam accuse Reen of damaging T.A. Islam's vehicle and would testify that she saw T.A. Islam vandalize his own traffic vehicle. Anderson claims that during the time she was there, T.A. Islam never tried to leave the scene and that she did not see Plaintiff behind T.A. Islam's vehicle or in the position depicted in T.A. Islam's photographs.

The testimony of Green and Anderson does not undermine the probable cause possessed by the arresting officers. Green was gone from the scene by the time T.A. Islam took the photographs of Plaintiff and Reen blocking his car; in other words, she was not present for the entire duration of the altercation and, in particular, was not present when T.A. Islam's car was blocked. Dkt. No. 106 ¶¶ 290-295. Her testimony adds nothing to the question whether Reen or Plaintiff engaged in OGA, much less whether the officers had probable cause.

As to Anderson, although she allegedly told Sgt. Burkitt that T.A. Islam had vandalized his own car, there is no evidence that she said anything to the officers regarding whether Plaintiff did or did not obstruct T.A. Islam from leaving. Dkt. No. 106 ¶¶ 296-308. Plaintiff's counsel admitted as much at oral argument. *See* Tr. 21:2-5 ("I don't believe that Ms. Anderson had any conversation with the officers one way or the other about the accusation of obstruction or lack of obstruction."). Thus, her observations—or lack of observations—which were not in the possession of the officers does nothing to undermine the officers' probable cause. *See O'Brien v. City of Yonkers*, 2013 WL 1234966, at *16 (S.D.N.Y. Mar. 22, 2013) ("[E]ven accepting Plaintiff's claim that there is a factual dispute regarding whether Defendants interviewed the two nonvictim witnesses to the robbery, the mere failure to interview potential witnesses does not overcome the presumption of probable cause."); *Parisi v. Suffolk County*, at *12 (E.D.N.Y. Nov. 30, 2009) (officers' alleged failure to locate and interview potential witnesses did not overcome probable cause).

Plaintiff also relies on the testimony of Bryan Bean ("Bean"), Plaintiff's nephew by marriage, that he was in the Plaintiff's truck when the two arrived at Cronston Avenue and that he did not see Plaintiff or Reen do anything that looked like they were trying to block the traffic agent's car from leaving and did not observe Plaintiff stand either in front of, or behind, the traffic vehicle. Bean testified that for much of the duration of the incident, he was with Plaintiff at Plaintiff's vehicle, which was parked "down the block" from T.A. Islam's vehicle, drinking coffee. According to Bean, he and Plaintiff walked from Plaintiff's car, which was parked 50 yards from T.A. Islam's vehicle, to a café which was even further away from T.A. Islam's vehicle, and back to the car. Dkt. No. 105-6 at 47:12-50:5. When Bean exited Plaintiff's car to get coffee, Plaintiff remained in the vehicle, and when he returned, Plaintiff was still in the

vehicle. *Id.* at 49:25-50:20. Bean testified that when he returned to Plaintiff's car, he "hand[ed] him his coffee, and then [the two of them stood] in front of [Plaintiff's] vehicle and talk[ed] while the incident was occurring." *Id.* at 50:16-20. The inference from Bean's testimony alone is that Plaintiff did not interact with T.A. Islam. Bean testified that he did not even remember Plaintiff walking towards the vicinity of the traffic agent's car and Bean did not observe Plaintiff go into the immediate proximity of the traffic agent's car at any point. *Id.* at 59:21-60:1. Bean did not testify to Plaintiff taking a photograph of T.A. Islam's car; he also was not interviewed by the arresting officers.

In a declaration submitted by Plaintiff, Plaintiff declares that "[f]or a significant amount of the time that I was on the block, I was in fact not even near Defendant Islam's car, but was instead down the block by my trick drinking coffee with my nephew Bryan Bean." Dkt. No. 101 ¶ 97. He admits (and embraces) that he took the photographs of T.A. Islam's car, but he says he did so "from a crosswalk approximately 6 or 7 feet behind Defendant Islam's car, and I took the photographs in a matter of seconds." *Id.* ¶ 19.

Defendants argued strenuously in their reply brief and at oral argument that the Court must disregard both Bean's testimony and the paragraphs from Plaintiff's declaration that refer to Bean based on the "sham affidavit" doctrine. That doctrine provides that a party "who has been examined at length on deposition" may not "raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony," as such conduct would "greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000) (citation omitted). Its logic is that the summary judgment process is compromised where a party, after having been examined on an issue and in that examination setting forth one version of facts, contradicts his own testimony in

an affidavit or declaration submitted only after discovery is closed and in response to the other side's motion for summary judgment. *See id.*; *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."). If testimony or discovery is incomplete, the time to correct an incomplete answer is before the close of discovery. *See* Fed. R. Civ. P. 26(e).

The sham affidavit doctrine is inapplicable to the deposition testimony of Bean. The evidence from Bean is not in the form of a declaration offered only after the close of discovery. He offered the evidence during his deposition in this case during which Defendants had the opportunity to cross-examine him. The deposition thus does not raise the same concerns as a sham affidavit does. Plaintiff has not manufactured a fact issue only after the close of discovery when Defendants did not have an opportunity to challenge it.

Defendants protest nonetheless that Bean's deposition should be considered a sham declaration and Plaintiff should not be permitted to rely upon it because it contradicts Plaintiff's own deposition testimony. Plaintiff did not testify to the presence of Bean on the scene and did not testify that he was "down the block" the entire time of the altercation. Thus, Defendants complain in essence that Plaintiff is attempting to do indirectly through the deposition of Bean what he would not be permitted to do directly through a post-discovery declaration of Plaintiff— to offer contradictory testimony.

The Court agrees with Defendants but only to a point and not for the reasons provided by Defendants. The Bean deposition is not a sham declaration or "sham" evidence as that doctrine has been developed by the Second Circuit. The Court is required on summary judgment to "view *all* evidence in the light most favorable to the nonmoving party and draw *all* reasonable

inferences in the non-moving party's favor." *Snead v. City of New York*, 463 F. Supp. 3d 386, 398 (S.D.N.Y. 2020) (citing *Anderson*, 477 U.S. at 255). Thus, "the Court must consider any testimony—whether from the plaintiff, the defendant, or a non-party—that forms the version of events most favorable to the non-moving party." *Id.* The fact that testimony offered by a non-party may differ from that of the party may go to the weight of evidence, but it does not categorically preclude the non-moving party from relying upon it. *See Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 482 (2d Cir. 2014) ("[W]here . . . testimony is contradicted by evidence other than the deponent's subsequent affidavit, . . . the concern that the proffered issue of fact is a mere 'sham' is alleviated.") (quoting *Corio*, 232 F.3d at 43-44).

Instead, the Court is persuaded that the correct analysis was provided by Judge Carnes concurring in *Evans v. Stephens*, 407 F.3d 1272 (11th Cir. 2005). That case involved a question similar to that the parties frame in this case—whether "[P]laintiff ca[n] rely upon the testimony of another witness where it contradicts her own version of events." *Id.* at 1278. The *en banc* court answered no on the facts of that case, stating that "[w]hen the nonmovant has testified to events, we do not (as urged by Plaintiffs' counsel) pick and choose bits from other witnesses' essentially incompatible accounts (in effect, declining to credit some of the nonmovant's own testimony) and then string together those portions of the record to form the story that we deem most helpful to the nonmovant." *Id.*[4] In his concurring opinion, Judge Carnes explained that the result did not turn upon some categorical rule that the nonmovant is precluded from relying on contradictory testimony offered by someone other than himself, but on more general summary judgment principles that require the non-movant to offer more than a scintilla of evidence and

---

[4] The court stated: "For summary judgment, we believe the evidence of the nonmovant (at least when, as here, the nonmovant's testimony is not doubtlessly incredible and the movant seems competent to give testimony)." *Evans*, 407 F.3d at 1298 n.6.

evidence that a reasonable jury could believe. He stated: "[A]bsent some extraordinary circumstance, no reasonable jury could believe that a party was lying when he said something harmful to his own case. Reasonable juries know that is not how human nature, influenced by self-interest works. And when we decide whether summary judgment is warranted we view the evidence in the non-movant's favor, but only to the extent that it would be reasonable for a jury to resolve the factual issues that way." *Id.* at 1284 (Carnes, J., concurring). It follows that where there may be a reason why a jury could credit the testimony of the non-movant over the movant—where for example, as offered by Plaintiff's counsel, the movant might not have recall all of the events—the non-movant should be able to rely upon evidence offered by someone other than himself. The question remains, however, whether the evidence—both that testified to by the movant and that testified to by others—creates a genuine issue of fact.

Applying that analysis here, some of the evidence offered by Bean is properly cognizable on the summary judgment record. Bean testified that at the time the officers arrived, he and Plaintiff were having coffee by Plaintiff's truck down the street from the altercation. That testimony is not inconsistent with Plaintiff's own testimony. Plaintiff's own testimony that, at least for a portion of the altercation, he spoke to T.A. Islam and then stood somewhere behind T.A. Islam's car to photograph can be reconciled with Bean's testimony that at the time the officers arrived, he and Plaintiff were drinking coffee down the block from T.A. Islam's vehicle. On the other hand, Plaintiff does not argue, and the Court would not credit any inference from Bean's testimony, that Plaintiff did not ever go near T.A. Islam's car and remained the whole time next to Plaintiff's truck down the street from the altercation. That testimony is flatly contradicted by Plaintiff's own testimony that he was behind the car taking photographs—which Plaintiff has vigorously embraced—and by all the other evidence in the record. It also is

incomplete; Bean was not in a position to observe Plaintiff during the entire time of the confrontation. No reasonable jury could credit that Plaintiff was in his truck down the street or outside drinking coffee the entire time. *See Scott*, 550 U.S. at 380.

The analysis is more straightforward with respect to Plaintiff's own less ambitious declaration submitted in opposition to summary judgment that he was standing behind T.A. Islam's vehicle for only a matter of seconds and that for a significant duration of the event he down the block with Bean. Defendants say Plaintiff did not offer that testimony in deposition and did not offer testimony regarding the presence of Bean at the incident or that he was drinking coffee with Bean down the block from T.A. Islam's vehicle for any duration of the incident. *See* Dkt. No. 111 at 18-26. Plaintiff's opposition declaration is not a sham affidavit, however, as it does not in fact contradict his prior testimony. At deposition, Plaintiff was asked where he was "before the incident," and he stated, "I was with my nephew [Bryan Bean]." Dkt. No. 105-1 at 25:10-14. Plaintiff later was asked and answered the following:

> Q: So to be clear, in the moment that you arrived, only you, Mr. Reen, and the Traffic
> agent were at the scene . . . Do you understand the question?
> A: Yeah. I don't know who was at the scene. I was just in my car.
> Q: Who do you remember at the intersection when you first arrived?
> A: Mr, I saw—yeah, okay, I saw Mr. Reen and—you know, I was at the stop sign and I
> saw Mr. Reen and the traffic agent talking on the sidewalk."

*Id*. at 25:24-26:24.

Plaintiff was never asked specifically if there was anyone in the car with him, or whom he was with at the incident. It is reasonable to infer that he interpreted the questions regarding who was at the scene to be asking whom he saw at the intersection when he arrived.

22

Nevertheless, even crediting Bean's version of events and Plaintiff's opposition declaration, taken as true for purposes of this motion, they do not undermine the officers' probable cause determination or create a genuine issue of material fact. Officers often make arrests based on imperfect information. *See Illinois v. Gates*, 462 U.S. 213, 241-246 (1983) (probable cause for warrant authorizing searches of defendants' home and car was established by anonymous letter indicating that defendants were involved in drug trafficking where portions of the letter were corroborated by information provided to the affiant by federal agents). That is the reason why the arrest reflects only probable cause and not an adjudication of guilt; the criminal defendant has not had the time to marshal the witnesses and evidence in his defense. For that reason, the existence of probable cause must be based on the facts known to the arresting officer at the time of the arrest. *See Figueroa*, 825 F.3d at 100. If information is not known and it is exculpatory, it may lead to a decision to dismiss charges or a favorable resolution, but it does not retroactively make the initial arrest unlawful.

That proposition dooms Plaintiff's argument here. Although presumably each of at least Anderson and Bean might have offered testimony in favor of Plaintiff at trial, there is no evidence that the information that they possessed was in the possession of the officers at the time of the arrest. Anderson did not speak to the officers about anything other than the scratching of T.A. Islam's vehicle, which was not the basis for Plaintiff's arrest. Bean—assuming for purposes of this motion he was down the block—never spoke to the officers at all. Nor has Plaintiff testified that he informed any of the officers at the scene or in the station that for a significant portion of the incident he was down the block drinking coffee with Bean. Thus, the testimony given by Green, Anderson, and Bean in this and the *Reen* case was not known to the officers at the time of Plaintiff's arrest and cannot make it unlawful—particularly in the face of

the direct evidence the officers had of Plaintiff's commission of the criminal offense. An "arresting officer does not have to prove plaintiff's version wrong before arresting him." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001). "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d at 123, 128 (2d Cir. 1997).

The officers thus had information supporting probable cause as to each of the essential elements of the crime for all of the reasons stated by Judge Brodie. The officers could conclude that Plaintiff and Reen intended to obstruct T.A. Islam both by their actions in situating themselves in the front and back of his vehicle when T.A. Islam was inside the vehicle and trying to leave and by Reen's own statement to the officers on the scene that he wanted T.A. Islam to remain on the scene until a supervisor arrived to report the traffic vehicle on the hydrant. Dkt. No. 102 ¶ 95; see *Reen*, 2018 WL 4608194, at *6. It is undisputed that T.A. Islam was a public servant performing an official function; he was in uniform, on duty, and patrolling the confines of the 100th prescient for parking violations. *Id*. The officers had probable cause that by placing themselves at the front and back of T.A. Islam's NYPD vehicle, Plaintiff and Reen prevented T.A. Islam from moving his car and from continuing to discharge his duties. The officers also had probable cause to believe that they did so by physical force and intimidation. On T.A. Islam's account, it was the placement of Reen and Plaintiff's bodies that prevented T.A. Islam from driving from the scene rather than any words that they uttered that interfered with governmental administration. Even if Plaintiff prevented T.A. Islam from continuing his duties for only a short while, the officers reasonably could conclude that was a crime. "While the interference in police activity must be physical in nature, 'physical interference' has been

broadly construed and can be 'minimal.' . . . '[I]nappropriate and disruptive conduct at the scene of the performance of an official function is sufficient.'" *Reen*, 2018 WL 4608194, at *6 (quoting *Basinski v. City of New York*, 706 F. App'x 693, 698 (2d. Cir. 2017); *Kass*, 864 F.3d at 209); *see also People v. Dumay*, 992 N.Y.S.2d 672, 676 (2014).

Finally, the two cases relied upon by Plaintiff, *Tschatat v. O'Hara*, 2017 WL 3172715 (S.D.N.Y. July 25, 2017) and *Mitchell v. City of New York*, 841 F.3d 72, 78 (2d Cir. 2016), are easily distinguishable.

The facts in *Tschatat* were egregious. As Plaintiff was leaving a Best Buy store, he was accused of shoplifting by a security guard. Several Best Buy employees brought him to a security holding room, attempted to handcuff him, and then—when Plaintiff refused—attacked him and repeatedly punched and kicked him even though Plaintiff did not fight back. He "was ultimately handcuffed while in a fetal position on the ground." 2017 WL 3172715, at *1. He subsequently was arrested by the NYPD and charged with petit larceny, criminal mischief in the fourth degree, and attempted assault in the third degree. The charges were based on the accusations—which turned out to be false—that he attempted to seal a memory card and that he assaulted the security guard. *Id.*

There was extensive evidence in *Tschatat* that the defendant officer conspired with the store employees to falsely accuse the Section 1983 plaintiff. The officer collected the packaging for the memory card, which was torn, and the receipt that the Best Buy staff had generated and vouchered them as arrest evidence, but he returned the original packaging to the store. Although he was given the actual memory card, he did not remember what happened to it. *Id.*, at *2. The officer took photographs of the security guard's face, who did not require medical attention from the incident, but did not take photographs of the Plaintiff—who was the subject of the attack.

Then, before trial, he lost the cellphone that contained the photographs of the security guard, but was unable to explain how he lost the cellphone or whether he ever intended to voucher the photographs into evidence. *Id*. When, at the time of the incident, the plaintiff asked the officer whether he had the receipt documenting the plaintiff's purchase, the officer responded "yes, but that no one 'is going to believe you because you're a criminal.'" *Id*. The officer did not ask to see surveillance footage at the store. Although an employee swore out an affidavit attesting that he saw plaintiff take the memory card and that he recovered the memory card from plaintiff, he later recanted that testimony. *Id*., at *5. Although the officer did not know any of the staff working that day at the Best Buy, he had been to the same store many times in the past in response to reports of shoplifting. *Id*., at *1.

Based on those facts, the court concluded:

A reasonable jury could conclude that, at the time of the arrest, O'Hara lacked a reasonable basis to suspect Plaintiff had committed a crime and, instead, collaborated with the Best Buy employees and security personnel to falsify accusations. First, Plaintiff adduces evidence that supports the inference that O'Hara purposely disposed of the physical evidence that would supposedly implicate Plaintiff and retained only a photograph of the memory card packaging that Plaintiff allegedly ripped open and threw away. Construing the facts in the light most favorable to Plaintiff, the photographs of Edmonds would have shown that he was not injured—injury being a necessary element for robbery in the second degree in this case, *see* N.Y. Penal Law § 160.10(2)(a); and the memory card and its packaging could have been subjected to fingerprint analysis revealing none of Plaintiff's fingerprints. The two items that O'Hara did voucher—the photograph of the torn packaging and the hypothetical receipt that would have been generated had the memory card been purchased—have no probative value on the issues of whether Plaintiff stole anything or hit anyone.

A reasonable jury also could find that O'Hara's explanation regarding the "lost" evidence is dubious. As to the photos of Edmonds, which O'Hara took with his personal cell phone, he did not take any steps to preserve them, either passively or intentionally; he took no steps to voucher them and could not recall if he even had intended to voucher them; and several months later he lost his phone and all of its contents under circumstances he claims not to remember. As to the memory card, the object of value that Plaintiff allegedly stole and that allegedly was recovered from his pocket, O'Hara does not remember what happened to it. As to the packaging, he testified that he returned it to Best Buy so the store could 'sell the

merchandise,' even though he acknowledged that the package was ripped and empty. O'Hara's role regarding the missing evidence supports an inference that O'Hara knew it could undermine the story he concocted with the Best Buy employees and disposed of it.

*Id*. at *4.

The court also concluded that "a reasonable jury could conclude that [the employee] was lying at the time of the arrest in collaboration with, or at the behest of, [the officer]. When coupled with the evidence that could support the inference that [the officer] purposely mishandled evidence, there is a genuine factual dispute about whether [the officer] knew that the version of events to which [the employee] initially attested was false." *Id*, at *5.

By contrast, the court granted summary judgment to another officer who relied on the assessment of probable cause by the first officer and who had no involvement in "handling the physical evidence, taking [the employee's] false statements, or otherwise participating in any collusive efforts [by the security guard] and the Best Buy employees to justify their mistreatment of Plaintiff after the fact." *Id*. at *5.

The facts in this case more closely resemble those amassed against the defendant on whose behalf the court granted summary judgment than those on behalf of whom the court denied summary judgment. There is no evidence here that the arresting officers "concocted" a false story to justify a foreordained decision to arrest the Plaintiff.

In *Mitchell*, the plaintiffs were two of at least 30 people who were arrested en masse on charges of trespassing when all 30 were observed in a building that the police surmised was abandoned and no one answered the question of who owned the property. The charge of trespass depended on the claim that the brownstone was abandoned and that the NYPD was therefore considered to be the lawful custodian of the property, but no member of the police checked the legal status of the property, and "signs of use" and a for-sale sign in the front yard suggested that

someone claimed ownership of the property. *Mitchell*, 841 F.3d at 78. The court held that "word of mouth among the officers" and the fact that no one claimed ownership of the property were insufficient to provide probable cause. *Id*. at 78-79.

### 2. Summary judgment is granted on false arrest claim against Captain Mahoney

Testimony from only one witness, Sgt. Burkitt, places Captain Mahoney at the scene during the incident and as making the arrest decision. *See* Dkt. No. 100-12 at 33:19-34:12, 48:9-20. Captain Mahoney himself and the other witnesses testify that Mahoney became involved only at the precinct after Reen and Plaintiff were arrested. *See* Dkt. No. 92-9 at 37:25-40:21. In his argument opposing summary judgment for Officer Grieshaber and Sgt. Burkitt, Plaintiff argues that it was the two of them who made the arrest and the arrest decision.

The motion and opposition to it present the question whether the non-moving party can resist a summary judgment motion filed by one party in a multi-party case by relying upon evidence that, if credited, would doom his claim with respect to another moving party. Defendants argue, with some force, that Plaintiff should not be able to argue in opposition to the motion of Officer Grieshaber and Sgt. Burkitt that those two officers made the arrest, while at the same time arguing in opposition to Captain Mahoney's motion for summary judgment that it was he who made the arrest. They argue, in essence, that Plaintiff may not take inconsistent positions. Neither party has identified any case to address the issue. Nonetheless, while Defendants' argument has force, the Court concludes that Plaintiff has the better of the argument.

Although contained in one filing, Defendants' "motion" may be considered to constitute several different motions for summary judgment. Each defendant is entitled to have the Court consider its motion in isolation based on all of the evidence in the case. It follows that, in opposing summary judgment, a plaintiff is entitled to have the court consider the "particular

parts of materials in the record" that the plaintiff believes demonstrates that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1)(A). At a trial, each party would be able to offer all of the evidence it believed supported each of its claims even if some of that evidence conflicted. *Cf. Garnett-Bishop v. New York Cmty. Bancorp, Inc.*, 49 F. Supp. 3d 321, 327 (E.D.N.Y. 2014) ("[C]onsolidation of actions pursuant to Fed. R. Civ. P. 42(a) 'does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another.'") (quoting *Primavera Familienstiftung v. Askin*, 173 F.R.D. 115, 130 (S.D.N.Y. 1997)). It may be that if the non-moving party successfully urged one version of the facts to prevail against one defendant (particularly as to liability), that party would be precluded by the law of judicial estoppel from pressing a different and contradictory set of facts against another defendant. *See Crawford*, 758 F.3d at 485–86 ("Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.") (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)); *In re Brizinova*, 592 B.R. 442, 456 (Bankr. E.D.N.Y. 2018) ("Judicial estoppel is an equitable doctrine which 'prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding.'") (quoting *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)). But, at this stage, where the only issue is whether the non-moving party should be deprived his jury trial right and where he has not prevailed on any theory of facts, there is no law that would require him to pick and choose. Summary judgment calls on the non-movant to establish only that facts are disputed and fit for a jury. It does not require him to commit absolutely to the veracity of a single set of facts. Nor, where the facts support two alternative versions of events, does the law permit or require the court to choose for him.

Plaintiff's false arrest claim against Captain Mahoney fails for a different reason. Assuming Captain Mahoney was on the scene and made the arrest decision, he would have had the same probable cause to arrest Plaintiff as the other officers. When Sgt. Burkitt was asked, "What was the nature of your conversation with Captain Mahoney at [the scene]," he responded, "I don't recall the actual conversation, but as a practice, I would have related the facts as they were relayed to me, any observations I would have made or conversations I would have had." *Id*. at 44:12-20; *see Panetta*, 460 F.3d at 395 ("When making a probable cause determination, police officers are 'entitled to rely on the allegations of fellow police officers.'") (quoting *Martinez*, 202 F.3d at 634); *see Loria v. Gorman*, 306 F.3d 1271, 1288 (2d Cir. 2002) ("[A] police officer is entitled to rely upon a fellow officer's determination that an arrest is lawful, so long as there are not 'significant indications to the contrary.'") (quoting *Martinez*, 202 F.3d at 634). For the same reasons the other officers had probable cause to arrest Plaintiff at the scene on the basis of T.A. Islam's statement and their observations, Captain Mahoney had the same.

Plaintiff also argues that if Captain Mahoney was not at the scene, a separate arrest was made at the precinct where Plaintiff's arrest report reflects the "location" of the arrest as "100 PRECINCT." Dkt. No. 92-16 at 1. The same report, however, undermines Plaintiff's argument as to Captain Mahoney: it lists Grieshaber as the "Arresting Officer" and Burkitt as the "Supervising Officer." *Id*. at 3. More importantly, all of the evidence in the case, including Plaintiff's own declaration and 56.1 statement, reflects that Plaintiff and Reen were told at the scene that they were not free to leave. *See* Dkt. No. 101 ¶ 59 ("I [Savarese] informed the police officers that I did not want to go to the precinct, but was told by the police that I had to."); Dkt. No. 102 ¶ 35 (admitting that "[a]fter Sgt. Burkitt's investigation [at the scene], Shaun Reen and

Plaintiff were informed that they were going to be placed under arrest").  It was at that point where, as a matter of Fourth Amendment law, the arrest was effected.

A seizure for Fourth Amendment purposes occurs where, under circumstances at issue, "a reasonable person would have believed that he was not free to leave." *Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991).  However, "not every seizure is an arrest," and "[w]hether an arrest supportable by probable cause occurs, as distinct from a form of Fourth Amendment intrusion supportable by less than probable cause, depends on the seizure's level of intrusiveness, and on the corresponding degree of justification required to effect each level of intrusiveness." *Id*. at 98. There is no "bright line rule" for determining whether an arrest or seizure short of arrest has taken place, rather it depends on the "reasonableness of the level of intrusion under the totality of the circumstances." *Id.*; *see Peterson v. Cnty. of Nassau*, 995 F. Supp. 305, 314 (E.D.N.Y. 1998) ("[O]ne cannot readily map out the facts on a grid to determine when the police have effectuated a lawful seizure, or, an arrest requiring probable cause.  Each case must be considered on its own merits, based on the information available to the police throughout the interval of detention."). "The determination does not turn on whether the suspect was told he was under arrest or formally charged." *Peterson*, 995 F. Supp. at 315.

In this case, it is undisputed that Plaintiff asked if he was free to leave and was told he was not and that he was taken to the precinct in the police vehicle.  Plaintiff cites no evidence to the contrary, and in fact admits that "[a]fter Sgt. Burkitt's investigation [at the scene], Shaun Reena and Plaintiff were informed that they were going to be placed under arrest," although Plaintiff's own testimony at deposition in the *Reen* case that he was not told he was under arrest, but that he was not permitted to leave.  *See* Dkt. No. 92-3 at 78:7-80:13.  Under those circumstances, an arrest supportable by probable cause had transpired.  *See, e.g. Dunaway v.*

*New York*, 442 U.S. 200, 212 (1979) (an arrest requiring probable cause occurred where "Petitioner was not questioned briefly where he was found" but "[i]nstead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room" and "[w]as never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape their custody"). It is immaterial that, in placing Plaintiff and Reen in the squad car and taking them to the precinct, the officers did not further demonstrate their use of force by handcuffing them. It also is not material whether the officers formally incanted the words you are "under arrest." *See id.* (arrestee was not handcuffed or told he was under arrest); *Peterson*, 995 F. Supp. at 315. Plaintiff was not free to leave even if it was only the officers, and not any set of handcuffs, that prevented his flight.

Given that the officers on the scene had probable cause to arrest, nothing that followed was unlawful. "[A] policeman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and for a brief period of detention to take the administrative steps incident to arrest." *Gerstein v. Pugh*, 420 U.S. 103, 113-14 (1975). Thus, Captain Mahoney's decision at the precinct not to release Plaintiff and Reen and to process them was not a separate Fourth Amendment event, whatever the significance of processing under state law, and regardless of the noted "location" of the arrest on the arrest report. *See Dunaway*, 442 U.S. at 212 ("The application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law."); *Posr*, 944 F.2d at 98-99 ("[O]nce the intrusion of an arrest has occurred, its definition does not depend upon what follows, such as station house booking.") (citing *United States v. Brunson*, 549 F.2d 348, 357 (5th Cir.), *cert. denied*, 434 U.S. 842(1977)). An arrestee is not

32

entitled to have each succeeding officer who takes custody of him make a separate probable cause determination.  Rather, after the arrest is made, "it is the neutral magistrate, not the executing officers, who determines whether probable cause continues to exist."  *United States v. Marin-Buitrago*, 734 F.2d 889, 894 (2d Cir. 1984).

### 3. Summary judgment is granted on false arrest claim against T.A. Islam and Youmans

The false arrest claim against T.A. Islam must also be dismissed and summary judgment granted but for a different reason.  A reasonable jury could conclude that T.A. Islam was lying when he reported to the arresting officers that Plaintiff and Reen had restrained his vehicle and prevented him from continuing to undertake governmental work.  There are disputed issues of fact regarding the conduct of Plaintiff and Reen.  The two say that they did not restrain T.A. Islam; T.A. Islam offers the contrary, backed by a photograph.

Summary judgment must be granted in favor of T.A. Islam because he "neither ordered nor executed Plaintiff's arrest."  *Reen*, 2018 WL 4608194, at *8 n.7.  Nor did T.A. Islam act in his capacity as a law enforcement officer to instigate Plaintiff's arrest.

In calling the police officers to a scene where he believed a wrong to have been committed against him personally and in informing the officers once they arrived of the relevant facts—while leaving to the officers the decision whether or not to make an arrest and not urging an arrest decision—T.A. Islam was doing no more than an ordinary civilian crime victim would be expected to do and would be privileged to do.  The facts, viewed favorably to the Plaintiff, cannot support a jury verdict against him without chilling those who happen to wear a blue uniform or who have agreed to undertake governmental service from reporting crimes to which they are victims, solely on the basis that they happen to wear a blue uniform or carry a badge.

As stated above, a Section 1983 action requires the presence of two essential elements: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States. *Pitchell*, 13 F.3d at 547. There is no triable issue that T.A. Islam's conduct did not satisfy either element.

T.A. Islam was not acting under color of state law in contacting the police and in answering the questions of the police regarding what happened to him. "To act under color of state law or authority for purposes of Section 1983, the defendant must 'have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Monsky v. Moraghan*, 127 F.3d 243, 245 (2d Cir. 1997) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)); *see United States v. Classic*, 313 U.S. 299, 326 (1941). A defendant may act under color of state law for purposes of Section 1983 where its conduct "satisfies the state-action requirement of the Fourteenth Amendment," i.e. "the defendant's alleged infringement of the plaintiff's federal rights is 'fairly attributable to the State.'" *West*, 487 U.S. at 49 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)).

"[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50. Thus, in parking his car on a hydrant and in delivering parking violation tickets, T.A. Islam plainly was acting under color of state law. However, not every action taken by a law enforcement officer is action taken under color of state law. *See Gleason v. Scoppetta*, 566 F. App'x 65, 68 (2d Cir. 2014). Rather, "[i]t is 'axiomatic that under 'color' of law means 'pretense' of law and that acts of officers in the ambit of their personal pursuits are plainly excluded.'" *Monsky*, 127 F.3d at 245 (quoting *Pitchell*, 13 F.3d at 547-48). There is "no bright line test for distinguishing

personal pursuits from activities taken under color of law," *Pitchell*, 13 F.3d at 548, and a court must "look to the 'nature of the officer's act' to determine whether he acted under color of state law, not just his 'status' of being on or off official duty," *Gleason*, 566 F. App'x at 68 (quoting *Pitchell*, 13 F.3d at 548). For example, it is relevant whether a state employee's "authority . . . is alleged to have contributed significantly to the conduct of which the plaintiff complains." *Monsky*, 127 F.3d at 245 (distinguishing a Fourth Circuit case finding no action under color of law where "the plaintiff and the defendants were all relatively low-level maintenance workers and none had authority over any others, [and therefore] the defendants had abused no 'authority' in harassing plaintiffs"); *see also Hughes v. Halifax County School Board*, 855 F.2d 183 (4th Cir. 1988).

In this case, T.A. Islam exercised no state authority in effectuating or instigating Plaintiff's arrest.

In notifying Citywide of the ongoing incident, T.A. Islam did not "exercise[] power possessed by virtue of state law and made possible only because [he was] clothed with the authority of state law." *Monsky*, 127 F.3d at 245 (internal quotation marks and citation omitted). T.A. Islam was reporting what he perceived to be a crime of which he was the victim. He was not enlisting the officers' help in continuing to carry out his governmental duties. T.A. Islam testified: "I called the Citywide, and I explained to them what happened. I explained the situation over the radio. I was really—it was really scary that day . . . [and I told them] 'I need information. I need help. Two guys obstructing me, and the situation is really bad.'" Dkt. No. 92-1:2-9. The conduct is thus no different from that of an ordinary citizen but for the fact that T.A. Islam happened to possess a badge. It is relevant that he made the call using a state issued radio, *see id*. at 37:1-4, however just as an official's "on duty" status is not dispositive of

exercising authority under color of law, nor is use of tools issued by the state dispositive. *See Pitchell*, 13 F.3d at 546-458 (shooting a bullet issued by the state was not done under color of state law). In placing his call, T.A. Islam was not exercising authority under the color of law and wielding that authority to cause harm to Plaintiff; he was seeking aid of the police in what he perceived to be a dangerous situation, just as every civilian is entitled to do without bringing their actions within the ambit of Section 1983. *See Fisk v. Letterman*, 401 F. Supp. 2d 362, 367 (S.D.N.Y. 2005) ("[A] private party who calls police officers for assistance or provides them with information that may lead to an arrest of an individual does not become a state actor rendering that party liable under § 1983 to the person detained, unless the police officers were improperly influenced or controlled by the private party."); *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214, 221 (E.D.N.Y. 2010) ("[P]roviding false information to the police does not make a private individual . . . a state actor and liable under § 1983.") (quoting *Chodkowski v. City of New York*, 2007 WL 2717872, at *8-9 (S.D.N.Y. Sept. 11, 2007)).[5]

---

[5] In a post-briefing letter, Plaintiff cites *Pukhovich v. City of New York*, 2018 WL 4688943, which also involved a traffic agent who was named as a defendant in a Section 1983 lawsuti after she alleged to police officers that she had been pushed by the plaintiff, and the plaintiff was then arrested for OGA. *Id.*, at *2-5. The court held that because the defendant traffic agent was performing her official duties when the incident occurred, the confrontation at issue grew out of the manner in which shew as performing those duties, and she used her government-issued radio to state (falsely, the plaintiff argued) that she was being assaulted by plaintiff, her actions were "fairly attributable to the State." *West*, 487 U.S. at 49 (quoting *Lugar*, 457 U.S. at 937); *see Pukhovich*, 2018 WL 4688943, at *14-15. The court stated: "Defendants do not explain how it can simultaneously be the case that defendant obstructed [the traffic agent's] performance of official duties, but that TEA Courtney's action in reporting that purported obstruction 'did not arise from her official duties.'" *Pukhovich*, 2018 WL 4688943, at *14. This Court respectfully disagrees. A person can be a victim of a crime one of whose elements is that he be a government employee or be conducting government business without being a state actor in his capacity as victim. The fact that it was T.A. Islam's performance of a governmental function that made Plaintiff and Reen's conduct a state crime thus does not itself mean that T.A. Islam was acting "under color of law" when he reported what happened to him or that he was by virtue of that fact alone exposed to potential liability as a state actor under Section 1983.

Similarly, in T.A. Islam's answers to the questions of the police at the scene, in the precinct, and in the District Attorney's Office, he did not invoke or utilize any state authority he possessed. Rather, in his capacity as a victim, he reported to the authorities, who did have arresting and prosecuting authority, a factual account of his version of events, which formed part of the basis on which the police and District Attorney decided to arrest and charge Plaintiff. It is significant that it is undisputed that T.A. Islam did not ask the officers to arrest or the authorities to prosecute. There is no evidence he invoked his governmental status to invade the officers' decision whether or not to arrest and whose version of events to believe. He left that to the officers. It also is significant that T.A. Islam is not himself a peace officer with authority to arrest based upon probable cause. *See People v. Williams*, 797 N.Y.S.2d 35, 37 (2005) ("A peace officer may arrest upon reasonable cause to believe an offense has occurred . . . whereas a citizen's arrest is justifiable only if the arrestee 'has in fact committed' an offense") (citing N.Y. C.P.L. §§ 140.25[1], 140.30[1]); N.Y. C.P.L. § 2.10 (defining "[p]ersons designated as peace officers" and omitting traffic agents). It was not his job to investigate crimes or to make arrests. In reporting to the police what he saw and experienced, he was not invoking any authority granted to him as an officer by the police but exercising the rights he had as a civilian.

The question is somewhat different with respect to the other act of T.A. Islam—his call to his supervisor Youmans—but the outcome is the same. A reasonable jury could conclude that T.A. Islam made that call in his capacity as an officer and in the course of and for the purpose of carrying out his governmental duties. Youmans was T.A. Islam's supervisor and T.A. Islam believed his ability to carry out his duties was being obstructed. It is reasonable to assume that he invoked his authority as a T.A. to seek Youmans' help in continuing to carry out his governmental duties. That constitutes state action.

The claim fails for a different reason. Youmans did not have the authority to make an arrest and was not involved in making the arrest and there is no evidence that T.A. Islam used Youmans as an intermediary to convey a message to the officers that the officers should make an arrest. Although there is evidence that Youmans asked the officers to make an arrest, there is no evidence that such request is attributable to T.A. Islam. He may have conveyed to her the facts as he understood and recalled them but there is no evidence that he asked her to have the officers take any particular action. From the record before the Court, Youmans acted on her own volition. And she was unsuccessful. Reen's own testimony is that the officers determined, after speaking with Youmans, not to arrest him and Plaintiff until they received further instruction from a supervisor. Thus, there is nothing that Plaintiff did with respect to Youmans that reasonably could be found to have effected a false arrest.

Even if T.A. Islam did not invoke state authority and was not acting as a state actor solely by virtue of his badge in reporting to the police, that would not necessarily immunize him from a claim for false arrest or a Section 1983 action. A person acting as a private civilian can be liable for false arrest under Section 1983 where (1) his conduct satisfies the elements of false arrest, and (2) he acts under the color or state law. *See Pitchell*, 13 F.3d at 547 (both state action and deprivation of rights, privileges, or immunities necessary to sustain Section 1983 claim); *Lienau v. Garcia*, 2013 WL 6697834, at *5-6 (S.D.N.Y. Dec. 19, 2013) (discussing the elements of holding a private party liable for false arrest under Section 1983); *see also Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful."). The two inquiries are related but analytically distinct. *See Weintraub v. Bd. of Educ. of City of New York*, 423 F. Supp. 2d 38, 56 (E.D.N.Y. 2006)

A person is liable for false arrest under New York law if he "causes or directs an arrest or imprisonment in New York" by "induc[ing] the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal to the point where the officer is not acting of his own volition." *Curley v. AMR Corp.*, 153 F.3d 5, 13-14 (2d Cir. 1998) (quoting 59 N.Y. Jur. 2d False Imprisonment § 37 (1987)); *cf. Mesiti v. Wegman*, 763 N.Y.S.2d 67, 70 (2d Dep't 2003) (jury verdict against a civil defendant for false arrest was affirmed where the defendant had "acted with undue zeal by affirmatively instigating the plaintiff's arrest"); *Carrington v. City of New York*, 607 N.Y.S.2d 721, 722 (2d Dep't 1994) (to make out a false arrest claim, "the plaintiff[] must show that these defendants instigated his arrest, thereby making the police [their] agents in accomplishing their intent to confine the plaintiff"). A defendant acts under color of state law where he is a "willful participant in joint activity with the State or its agents." *United States v. Price*, 383 U.S. 787, 794 (1966). "The touchstone of joint action" with the state "is often a 'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police." *Forbes v. City of New York*, 2008 WL 3539936, at *5 (S.D.N.Y. Aug. 12, 2008) (citing *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999)); *see also Lienau*, 2013 WL 6697834, at *5; *Manbeck v. Micka*, 640 F. Supp. 2d 351, 379 (S.D.N.Y. 2013). "The Supreme Court has also explained joint action through the concept of a 'meeting of the minds' between law enforcement and private individuals." *Lienau*, 2013 WL 6697834, at *5 (quoting *Forbes*, 2008 WL 3539936, at *5); *see Adickes v. Kress & Co.*, 398 U.S. 144, 158 (1970). Private conduct may also constitute state action "'where the state exercises 'coercive power' over, is 'entwined in [the] management or control' of, or provides 'significant encouragement, either overt or covert' to, a private actor, or where the private actor 'operates as a willful participant in joint activity with the State or its

agents,' is 'controlled by an agency of the State,' has been delegated a 'public function' by the state, or is 'entwined with governmental policies.'" *Defeo v. Leibstein*, 2018 WL 5777023, at *3 (E.D.N.Y. Nov. 1, 2018) (quoting *Tancredi v. Metro. Life Ins. Co.*, 316 F.3d 308, 313 (2d Cir. 2003)) (internal citations omitted).

At the same time, it is settled that "seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed" does not make out a claim for false arrest or malicious prosecution under New York law. *Delince v. City of New York*, 2011 WL 666347, at *4 (S.D.N.Y. Feb. 7, 2011) (quoting *DuChateau v. Metro-North Commuter R. Co.*, 688 N.Y.S.2d 12, 15 (1st Dept. 1999)); *see Gilman v. Marsh & McLennan Cos., Inc.*, 868 F.2d 118, 128 (S.D.N.Y. 2012) (same); *Johnson v. Follett Higher Educ. Grp., Inc.*, 979 N.Y.S.2d 393, 394 (2d Dep't 2014) (same). Similarly, "the provision of information to or summoning of police officers, even if that information is false or results in the officers taking affirmative action, is not sufficient to constitute joint action with state actors for purposes of § 1983," *Defeo,* 2018 WL 5777023, at *4 (quoting *Young v. Suffolk Cnty.*, 705 F. Supp. 2d 183, 196 (E.D.N.Y. 2010)), as the statute "does not impose civil liability on persons who merely stand to benefit from an assertion of authority under color of law, but only on those who *act* under color of law," *id*. (quoting *Ginsberg*, 189 F.3d at 273); *see also Lienau*, 2013 WL 6697834, at *6 ("[I]f a police officer's actions are based on the officer's own independent judgment, rather than the directive of the private party, the private party will not be deemed a state actor.") (collecting cases).

The evidence in this case, construed in Plaintiff's favor, does not support that T.A. Islam's conduct meets the elements of false arrest or that he acted under color of law to support a claim under Section 1983. There is no evidence that he "induc[ed] any officer to act" or

"procur[ed] [the arrest] to be made" or that any of the officers were acting under his influence and not "of [their] own volition." *Curley*, 153 F.3d at 13. There is not even evidence that he "instigated," or asked the officers to make an arrest, *see Carrington*, 607 N.Y.S.2d at 722. The parties dispute which call led the arresting officers to arrive at the scene—the earlier call that Reen had his sister and McNamara make by dialing 911 or the later call that T.A. Islam made to Citywide. Dkt. No. 90 ¶¶ 23, 33; Dkt. No. 102 ¶¶ 60, 82. But even assuming that the officers were responding to T.A. Islam's call alone, there is no evidence that T.A. Islam wanted the two to be arrested as opposed to, for example, calling in order to resolve a situation that had gotten out of hand.

There also is no evidence of any "'plan, prearrangement, conspiracy, custom, or policy' shared by the private actor and the police," *Forbes*, 2008 WL 3539936, at *5 (citation omitted), or any "'meeting of the minds' between law enforcement and private individuals," *Lienau*, 2013 WL 6697834, at *5 (citation omitted), or that T.A. Islam assumed for himself or was given a "public function" exercised by the state, *Defeo*, 2018 WL 5777023, at *3. The evidence is undisputed that he was not a peace officer under New York law; he had no authority to make an arrest. The evidence also is undisputed that he left it to the NYPD officers on the scene to make their independent decision whether to make the arrests. He did not exercise overweening authority or influence over the officers. There is no evidence that he used the fact that he had a badge to influence the officers' decision to arrest Plaintiff or Reen. He merely summoned the police and reported to them his account of what he had experienced. That is the precise conduct that the courts have held can neither support a state law false arrest claim nor satisfy the Section 1983 "under color of law" requirement.

Judge Glasser's opinion in *Weintraub* is informative. *See Weintraub*, 423 F. Supp. 2d at 55-58. In that case, as in this, the plaintiff alleged that a public official who lacked the authority to make an arrest was nonetheless liable for making a false report to the police. The relevant defendants were a public school teacher and two administrators. The court did not stop its analysis with the fact that the allegedly false report was made by a public official. The court considered the school official to be akin to a private party. Even if a school official was a state actor for the purposes of plaintiff's First Amendment claim when sued for their decision to terminate plaintiff's employment, *see id.* at 52-53, the court assumed that the school official was a private citizen entitled to "furnish information to the police in good faith" for the police to make their own independent judgment with respect to plaintiff's Fourth Amendment false arrest claim. *Id*. at 55. The court sustained the complaint on the facts there only because the defendant "told the officers that she wanted Weintraub arrested," *id*. at 46, and, as the case has since been virtually universally understood, because it "involved allegations demonstrating a long-standing vendetta by the private defendant against the plaintiff," *Lienau*, 2013 WL 6697834, at *8 (citing cases), and "defendants had histories of filing baseless complaints against the plaintiffs," *Delince*, 2011 WL 666347, at *3; *see also Samtani v. Cherukuri*, 2012 WL 1657154, at *4 (E.D.N.Y. May 11, 2012), *judgment vacated on reconsideration on other grounds*, 2012 WL 1821413 (E.D.N.Y. May 18, 2012) (collecting cases distinguishing *Weintraub* based on the history of defendants' complaints against plaintiff); *Thomas v. City of New York*, 2013 WL 3810217, at *4-5 (E.D.N.Y. July 23, 2013) (distinguishing *Weintraub* on grounds that "[u]nlike the longstanding vendetta in *Weintraub*, which consisted of 11 acts over more than 1 year, plaintiff alleges just 3 acts occurring within 1 week," and holding that "even assuming that the

[private] defendants made a false report to the police, bad faith cannot be inferred from [that] act alone").

This case is different. There is no evidence that T.A. Islam asked for Plaintiff or Reen to be arrested. There also is no evidence that T.A. Islam acted in bad faith in summoning the police or in making his report to them. There is no evidence that T.A. Islam even knew Plaitniff and Reen before the incident at issue, much less that he harbored a vendetta or had made any prior false allegations about them or had any motive or intent to cause them to be falsely arrested. At best, there is evidence that T.A. Islam gave a report to police that was disputed by Plaintiff and Reen and left it to the police to make their own judgments. But that cannot support a Section 1983 claim without deterring private individuals and government officials alike from responding to police investigations and making the reports on which our system of law enforcement and public safety depend.

Similarly, the claim of false arrest is dismissed as against Youmans because she also did not cause Plaintiff's arrest. Although there is an issue whether Youmans requested that the officers arrest Plaintiff and Reen, it is undisputed that the officers declined that request in favor of awaiting a supervisor and making an independent determination whether to arrest. Thus it cannot be said that Youmans "affirmatively induced the officer to act" or that the officers, in making the arrest, were not "acting of [their] own volition" but at the behest of Youmans. *Curley*, 153 F.3d at 13-14. Moreover, there is no evidence that Youmans had any inkling that what T.A. Islam told her unfolded was untrue. Thus, she was merely in the position of "furnish[ing] information to the police in good faith," upon which the police "exercise[ed] independent judgment to arrest" plaintiff—which does not support a Section 1983 claim for false arrest. *Weintraub*, 423 F. Supp. 2d at 55.

### 4. Summary judgment is granted as to false arrest claim on theory of conspiracy

Finally, Plaintiff argues that even if each individual officer had at least arguable probable cause and thus a defense against a false arrest claim, when the knowledge and conduct of that officer is considered in isolation, Plaintiff's complaint is rescued by his allegation that the officers acted in conspiracy. Even if T.A. Islam was acting in an individual capacity, Plaintiff claims, T.A. Islam and the arresting officers can still be liable for a civil rights conspiracy. Plaintiff is right on the law that an individual who conspires with the police can be liable for a civil rights violation. He is wrong that the evidence creates a genuine issue of fact.

"To prove a Section 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999). To prove a conspiracy claim, a plaintiff "must provide some factual basis supporting a meeting of the minds." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). "To survive a motion for summary judgment, [the] plaintiff's evidence of a [Section] 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *Falls*, 2021 WL 1164185, at *58 (quoting *House v. City of New York*, 2020 WL 6891830, at *20 (S.D.N.Y. Nov. 24, 2020)).

Plaintiff asserts that a reasonable jury could conclude that the officers conspired with T.A. Islam (who was a uniformed member of the NYPD), who "was offended at the criticism Reen and Plaintiff were directing at him for parking his traffic vehicle in front of a fire hydrant, and at Plaintiff for taking photos of his car," to arrest Plaintiff for taking those photographs on trumped up charges "based upon fabricated evidence." Dkt. No. 104 at 37. As evidence that

Plaintiff claims requires a trial on that theory, Plaintiff points to his deposition testimony that Captain Mahoney told him "that next time [he] should show a little respect and not take any pictures." Dkt. No. 104 at 43.

Defendants have three responses. First, Defendants claim that Plaintiff did not allege a conspiracy claim in his complaint. That argument is mistaken. Although perhaps not the most artfully pleaded, both the first claim and the third claim refer to conspiracy. The first claim explicitly states explicitly Defendants violated Plaintiff's constitutional rights "by conspiring against Plaintiff." Dkt. No. 1 ¶ 103. The third claim states that the City of New York has a policy of "cover[ing]-up of other law enforcement officers' misconduct, through conspiracy." *Id*. ¶ 112. That is sufficient.

Second, Defendants argue that the allegations fail under the intracorporate conspiracy doctrine. Under that doctrine, "the officers, employees, and agents of the same corporate entity acting within their scope of employment, along with the corporate entity itself, are considered a single entity and are legally incapable of conspiring with each other." *Biswas v. City of N.Y.*, 973 F. Supp. 2d 504, 534 (S.D.N.Y. 2013). "Although the Second Circuit has yet to extend this doctrine to § 1983 conspiracy claims, 'courts in this district have uniformly applied the rule to Section 1983 cases as well.'" *Nollah v. City of New York*, 2018 WL 4636847, at *4 (S.D.N.Y. Sept. 27, 2018) (quoting *Dowd v. DeMarco*, 314 F. Supp. 3d 576, 587 (S.D.N.Y. 2018)); *see Anemone v. Metro. Transp. Auth.*, 419 F. Supp.2d 602, 604 (S.D.N.Y. 2006) (collecting cases).

"[T]he intracorporate conspiracy doctrine contains an important caveat: namely, that the [T]he actors involved be engaged in activities within the scope of their employment." *Randle v. Alexander*, 960 F. Supp.2d 457, 475 (S.D.N.Y. 2013); *see Anemone*, 419 F. Supp. 2d at 604 (noting that the "two or more actors" requirement for a conspiracy "cannot be satisfied where all

45

of the alleged conspirators are employees of a single entity and acting within the scope of their employment as agents of that entity"). The intracorporate conspiracy doctrine is based ultimately on the notion that the dangers presented by a conspiracy are not presented by the combined actions of "officers of a single [entity] [who] are not separate . . . actors pursuing separate … interests." *Copperweld Corp. v. Independence Tube Corp.*, 457 U.S. 752, 770 (1984). That rationale squarely applies when the accusation of conspiracy is levelled at a group of NYPD officers, each of whom participates as a member of the police in the arrest of a citizen. In that case, the allegation of conspiracy adds nothing. It is rare that the police will act alone, and "[e]ven without a Section 1983 conspiracy claim, a plaintiff who suffers a constitutional injury can still assert direct Section 1983 claims against each and every public employee who participated in the deprivation in his or her individual capacity seeking both compensatory and punitive damages." *Anemone*, 419 F. Supp. 2d at 604.

Defendants' argument that the intracorporate conspiracy doctrine applies here fails for the same reason that their state action argument with respect to T.A. Islam succeeds. Although the arresting officers were acting within the scope of their employment in making arrests, it cannot be said that T.A. Islam was acting within the scope of his employment in reporting what he alleged to be a crime against him. He was not a cop on the beat looking to make arrests—and, in fact, was not authorized to make arrests, *see supra*—but a traffic agent looking to hand out tickets. In making the report, he was pursuing instead a personal interest—a crime against him personally. In that respect, although he wore a NYPD badge, his role in this case and the defenses he would have against charges against him individually are no different from that of any complaining witness or victim to a crime. The evidence and allegations in this case, thus, do not fit within the intracorporate conspiracy doctrine.

Defendants' third argument, however, reveals that Plaintiff's effort to reformulate his individual Section 1983 claims as a conspiracy claim fail for a more fundamental reason. T.A. Islam and the arresting officers can bear liability under Section 1983 only if they agree amongst themselves to act in concert to inflict an unconstitutional injury and take an overt act in furtherance thereof. *See Weintraub*, 423 F. Supp. at 57 ("[C]orruptly conspiring with a state actor can subject a private party to liability [under Section 1983]."); *Adickes*, 398 U.S. at 152 ("Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [Section 1983].") (quoting *Price*, 383 U.S. at 794). Plaintiff has adduced no evidence from which a reasonable jury could conclude that such a conspiracy existed. Plaintiff's claim is based ultimately on the notion that T.A. Islam and the arresting officers were each motivated to make a false accusation against Plaintiff because Plaintiff (and Reen) had observed T.A. Islam violating parking rules and Plaintiff had taken a photograph of T.A. Islam doing so. But Plaintiff has offered no evidence that any of the alleged conspirators had that motive, much less that they agreed together to make a false arrest. T.A. Islam contacted Citywide only after Reen and Plaintiff had stood on either side of his vehicle; his calls to Citywide and to his supervisor were "to indicate that he was being obstructed from continuing to perform his job." Dkt. No. 102 ¶¶ 79-80. They were not to report the scuffle over where his vehicle was parked or that Plaintiff had taken a photograph of him. Indeed, although on this record it is admitted that T.A. Islam explained to the officers (among other things) that Reen had complained about T.A. Islam parking by the fire hydrant, there is no evidence that he even mentioned Plaintiff's photograph to the officers.

There also is no evidence that, in accepting T.A. Islam's account of the incident and in rejecting that of Plaintiff and Reen, the arresting officers were doing anything other than

exercising their independent judgment about whether T.A. Islam's account should be believed and whether the evidence made out a claim for OGA. Plaintiff offers no reason to believe, for example, that the arresting officers would have an interest in protecting T.A. Islam parking on the hydrant. Indeed, Plaintiff elsewhere admits that it was not until after Sgt Burkitt arrived at the scene and until after Sgt. Burkitt had the opportunity to talk with each of the three participants (Reen, Plaintiff, and T.A. Islam) that the decision to arrest was even made. *See* Dkt. No. 90 ¶ 54. Taking to its logical conclusion, Plaintiff's allegation would prevent the police from ever arresting an individual for OGA for fear that the allegation that all members of law enforcement are necessarily in league would suffice to make out a claim for civil rights conspiracy.

The argument gains nothing from the claim that Captain Mahoney's alleged statement at the precinct that to avoid arrest, "next time Plaintiff should show a little respect and not take any pictures." Dkt. No. 101 ¶ 57. That statement does not reflect the existence of a conspiracy. There is no evidence that Plaintiff has proffered that T.A. Islam said anything to Captain Mahoney about the complaints that he was parking on the hydrant or that a photograph had been taken of him. Rather, it was Plaintiff himself who mentioned to Captain Mahoney that he had taken photographs: when Captain Mahoney asked what Plaintiff had done, Plaintiff answered that he "had basically just gone behind Islam's car and taken a couple of pictures." Dkt. No. 102 ¶ 157. Indeed, according to Plaintiff, it was not until that time that "the Captain's demeanor changed," and it was only after Plaintiff's statement that Captain Mahoney allegedly made his statement about taking pictures. *Id*. There is no evidence of any communication among T.A. Islam and the officers about Plaintiff taking pictures.

"Participation in a conspiracy or the fabrication of evidence . . . cannot be based upon unsubstantiated speculation and conjecture about what could have been said at a certain meeting or in a particular discussion.  More is necessary under the law to overcome a summary judgment motion and require a defendant to proceed to trial for a violation of a plaintiff's civil rights." *Moroughan v. Cnty. of Suffolk*, 2021 WL 298714, at *2 (E.D.N.Y. Jan. 20, 2021).  Here, as in *Falls*, "Plaintiff has produced no evidence to substantiate his fanciful tale that police and [T.A. Islam] orchestrated an elaborate scheme to fabricate and falsify records" or to cause Plaintiff's arrest.  *Falls*, 2021 WL 1164185 at *58 (granting summary judgment on § 1983 conspiracy claim).

### B.     First Amendment Retaliatory Arrest Claim

Plaintiff presents three theories to support his First Amendment retaliation claim: (1) the arrest was in retaliation for his exercise of First Amendment rights when he complained about T.A. Islam parking on the hydrant and when he took a photograph of T.A. Islam's car; (2) Captain Mahoney caused his prolonged detention in retaliation for his failure to "show respect" and for his taking a photograph; and (3) T.A. Islam backed up his car at Plaintiff in retaliation for the photograph.  The Supreme Court has stated that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  *City of Houston v. Hill*, 482 U.S. 451, 462 (1987).  None of Plaintiff's theories or evidence, however, presents a genuine issue for trial.

First, Plaintiff does not present a genuine issue for trial that his arrest was retaliatory in violation of the First Amendment.  Under *Nieves v. Bartlett*, "[a] plaintiff alleging a First Amendment claim of retaliatory arrest must at the threshold plead and prove the absence of probable cause for the arrest" except where he "presents objective evidence that he was arrested

when otherwise similarly situated individuals not engaged in the same sort of protected speed had not been." 139 S. Ct. 1715, 1724, 1726 (2019). Unless the plaintiff proves the absence of probable cause or presents objective evidence that he was arrested when other similarly situated individuals would not have been, "the statements and motivations of the particular officer are 'irrelevant.'" *Id*. at 1727. The Court here has concluded that there was probable cause for arrest. Plaintiff has not presented evidence that he was arrested when other similarly situated individuals would not have been.[6] His theory thus fails.

Second, accepting as the Court must that Captain Mahoney stated that Plaintiff was being arrested for failing to "show respect" and for taking pictures, there is no evidence that Captain Mahoney's views had anything whatsoever to do with the length of time Plaintiff was in detention before being presented in court. Plaintiff has presented evidence that the statement was made to him and Reen alone. There is no evidence that Captain Mahoney communicated with anyone at Queens Central Booking or that he asked Queens Central Booking to delay Plaintiff's arraignment. To the contrary, the uncontroverted documentary evidence presents non-retaliatory reasons for the length of time it took for Plaintiff to be arraigned.

Third, construing the evidence in favor of Plaintiff, there also is no evidence that T.A. Islam retaliated against Plaintiff or took action that "effectively chilled [or threatened to chill] the plaintiff's exercise of those [First Amendment] rights." *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008). Plaintiff does not disagree with Reen's observation that when T.A.

---

[6] Plaintiff does not argue that T.A. Islam's actions in calling the police alone constituted a First Amendment violation, even if the evidence could support that he did so in retaliation for Reen having complained about him being on a hydrant and Plaintiff having taken photographs of him. The call to the police alone did not impose any governmental restraint on Plaintiff. The evidence is undisputed that it was the independent decision of the police officers and not the decision of T.A. Islam that resulted in Plaintiff being detained.

Islam was trying to leave and Plaintiff was behind his vehicle, T.A. Islam "put on the lights and sirens and put the car in reverse, went only a few inches and hit the brakes." Dkt. No. 102 ¶ 66. Indeed, on Plaintiff's own account, he was 6-7 feet behind Islam's car. *Id.* ¶ 64. No reasonable jury could conclude either that such action was intended to chill Plaintiff's exercise of First Amendment rights or that it did chill the exercise of those rights. Indeed, Plaintiff admits that T.A. Islam did not prevent Plaintiff from taking the photographs and thus exercising his rights.

### C. Fabrication of Evidence Claim

Plaintiff alleges that T.A. Islam and Officer Grieshaber violated his constitutional fair trial rights and fabricated evidence. T.A. Islam told the District Attorney's Office that Plaintiff had been standing at the rear of T.A. Islam's vehicle and holding his cellphone, that T.A. Islam had asked Plaintiff and Reen to move, and that Reen and Plaintiff had refused to move. *Id.* ¶¶ 198-199. He also signed a supporting declaration attesting to the truth of the allegations in the Criminal Court Complaint that Plaintiff obstructed T.A. Islam's ability to move his vehicle and refused an instruction to move. Dkt. No. 92-26. Officer Grieshaber also signed the Criminal Court Complaint "based on what T.A. Islam informed him." Dkt. No. 102 ¶¶ 196-97. He also told the District Attorney's office that he personally saw Plaintiff standing behind T.A. Islam's car, and he did not do anything else to investigate other than to talk to Plaintiff, Reen, and T.A. Islam. Dkt. No. 100-7 at 58:8-59:9, 60:3-20. According to Plaintiff, Plaintiff was only briefly behind T.A. Islam's car in conjunction with lawfully exercising his First Amendment rights and he was neither asked by T.A. Islam to move nor did he refuse to move. Dkt. No. 101 ¶ 19. Finally, Plaintiff argues that Officer Grieshaber's failure to tell the District Attorney's Office about Anderson's report to the officers on the scene that T.A. Islam vandalized his own car with a key and tried to blame Reen was a material fabrication by omission. Dkt. No. 104 at 46 n.15.

To establish a fair trial claim based on fabrication of evidence, a plaintiff must show that "an (1) investigating office (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016). Unlike a false arrest claim, "probable cause is not a defense to a claim for a denial of the right to a fair trial." *Id.* at 277. However, "Plaintiff is required to establish not only that the police fabricated evidence, but also that this evidence caused his deprivation of liberty." *Falls*, 2021 WL 1164185, at *36 (citing *Moroughan*, 2021 WL 298714, at *34). "Despite the 'nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself,' and, as relevant here, 'a criminal defendant can bring a fair trial claim even when no trial occurs at all.'" *Id.* at *35 (quoting *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 249 (2d Cir. 2020)).

It is not necessarily fatal to Plaintiff's claim that the police did not rely on a particular piece of allegedly fabricated evidence to bring charges against Plaintiff. *See, e.g., id.* at *35. The test is whether "the fabricated evidence was material." *Nigro*, 2020 WL 7629455, at *2. Thus, omitted information that goes to the credibility of a critical piece of evidence, no less than the evidence itself, may "'critically influenc[e]' the decision to prosecute [the plaintiff], thereby resulting in a deprivation of his liberty." *Falls*, 2021 WL 1164185, at * 37 (quoting *Frost*, 980 F.3d at 250)); *see also Tortora v. City of New York*, 2019 WL 9100369, at *23 (E.D.N.Y. Mar. 30, 2019), *aff'd*, 804 F. App'x 35 (2d Cir. 2020) ("Fabrication of evidence by omission is one way to establish a fabrication of evidence claim.").

Plaintiff fails to establish a genuine issue of fact with respect to the claim against T.A. Islam. The Court cannot do much better than restate the sound reasoning of Judge Brodie in considering the analogous claim presented in *Reen*:

> T.A. Islam did not sign the criminal complaint and was not acting in an
> investigatory capacity when he provided his statement to the D.A.'s Office.
> Instead, T.A. Islam provided his statement to the D.A.'s Office as a complaining
> witness. As a witness, T.A. Islam has absolute immunity for his testimony in
> judicial proceedings. This immunity extends to T.A. Islam's discussions with the
> prosecutor.

*Reen*, 2018 WL 4608194, at *26.

Plaintiff contends, in essence, that because T.A. Islam also wore a NYPD badge and was

engaged in official duties on July 1, 2015, any report that T.A. Islam would have made to law

enforcement or the D.A.'s office about Reen and Plaintiff's conduct toward him must be

measured against the standards applicable to an investigating officer. That argument, however,

fundamentally misunderstands the rationale for the fair trial right. The Constitution's guarantee

to a defendant that the police will not fabricate evidence is rooted in the notion that "[l]ike a

prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's

fabrication and forwarding to prosecutors of known false evidence works an unacceptable

'corruption of the truth-seeking function of the trial process.'" *Ricciuti*, 124 F.3d at 130

(quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). "No arrest, no matter how lawful or

objectively reasonable, gives an arresting officer or his fellow officers license to deliberately

manufacture false evidence against an arrestee." *Id.* The violation thus is addressed to the harm

that is caused when a person charged with conducting an investigation betrays the fair trial

process and makes the investigation a mockery by the creation of false or manipulated evidence.

It is not addressed to the reporting of information to the police by one who is not in an

investigatory or prosecutorial role.

When a police officer is asked to testify about crimes that were inflicted on him, he

enjoys the same immunity enjoyed by a lay witness. That is because when it comes to the

percipient testimony of an officer about what happened to him, there is no "reason to distinguish law enforcement witnesses from lay witnesses." *Rehberg v. Paulk*, 566 U.S. 356, 367 (2012).

With respect to Officer Grieshaber, in *Reen* Judge Brodie found the evidence sufficient to create a triable issue of fact because, while Officer Grieshaber stated in the criminal complaint that he was informed by T.A. Islam that Reen refused to move when asked to do so by T.A. Islam, Officer Grieshaber did not recall that information when testifying at deposition in the *Reen* case. *Reen*, 2018 WL 4608194, at *11. This Court respectfully disagrees. It is not an infrequent occurrence that a member of law enforcement, like any other witness, might not recall a fact he or she once knew. Such is not a failing of the criminal justice system. When this occurs as a result of the testing of memory through the crucible of cross-examination or the adversarial process, it reflects not a corruption but a triumph of the criminal justice system. *See, e.g. Briscoe v. LaHue*, 460 U.S. 325, 333-34 (1983) ("[T]he truth-finding process is better served if the witness's testimony is submitted to 'the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.'") (quoting *Imbler v Pachtman*, 424 U.S. 409, 440 (1976)). It follows that a later failure of recollection cannot alone serve to create a triable issue that the fact not recollected never existed and was falsely manufactured. Were it otherwise, every memory challenged on cross-examination would not only result in acquittal but in a separate lawsuit for fabrication of evidence. The search for the truth would not be enhanced, but instead would be compromised, as a candid statement that the officer no longer remembered an event would become grist for imposing civil liability on the theory that such truthful testimony demonstrates an earlier fabrication of evidence.

There is another less grandiose reason why Officer Grieshaber's failure of recollection cannot serve as proof positive that the unrecollected fact did not occur. "Testimony of a witness that he does not remember whether an event occurred does not contradict positive testimony that such event took place." *Gibbons v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 2015 WL 2345533, at *3 (D. Nev. May 15, 2015) (citation omitted). Indeed, "vague denials and memory lapses . . . do not create genuine issues of material fact." *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 205 F.3d 66, 75 (2d Cir. 2000).

None of the other evidence offered against Officer Grieshaber creates a genuine issue of material fact. Plaintiff argues that Officer Grieshaber, as the deponent on the Criminal Court Complaint, "falsely attested . . . that he was informed by [T.A.] Islam that [T.A.] Islam observed Mr. Reen in front of his car, and Plaintiff behind his car, that Defendant Islam asked Plaintiff and Mr. Reen to please move and that Mr. Reen and Plaintiff refused to move." Dkt. No. 104 at 44. There is no genuine dispute, however, that T.A. Islam in fact did tell Officer Grieshaber that version of events. Moreover, although the parties also dispute whether Reen scratched T.A. Islam's car or T.A. Islam scratched it himself, the scratching of the car formed no part of the case against Plaintiff and did not undermine T.A. Islam's testimony that Plaintiff blocked his vehicle.

Finally, following the Supreme Court's decision in *McDonough v. Smith*, 139 S. Ct. 2149 (2019), it is now clear that a fair trial claim requires a plaintiff to plead and prove "favorable termination" and that a plaintiff who is granted an adjournment in contemplation of dismissal cannot do so, "at least where, as here, the 'claim challenges the very evidence that supported the initiation of criminal proceedings against him.'" *Nigro*, 2020 WL 7629455, at *3 (quoting *Corso v. Calle-Palomeque*, 2020 WL 2731969, at *7 (S.D.N.Y. May 26, 2020)); *see Daniels v. Taylor*,

443 F. Supp. 3d 471, 476-80 (S.D.N.Y. 2020); *Miller v. Terrillion*, 436 F. Supp. 3d 598, 603-04 (E.D.N.Y. 2020).

Plaintiff argues that even if *McDonough* now requires evidence that his criminal proceeding terminated favorably, his receipt of an ACD reflects a favorable termination. In making this argument, Plaintiff echoes arguments made and rejected in *Rothstein v. Carriere*, 373 F.3d 275, 286-87 (2d Cir. 2004) and *Singleton v. City of New York*, 632 F.2d 185, 193-94 (2d Cir. 1980), *cert denied*, 450 U.S. 920 (1981): "Plaintiff accepted an ACD on September 10, 2020 because it was not in any way an admission of guilt (and because Plaintiff had done nothing remotely illegal or wrong) and would result under New York law in nullifying his arrest and placing him back in the position he was in prior to the arrest in the eyes of the law, and because otherwise continuing to fight the false charge would have been expensive and time-consuming." Dkt. No. 104 at 40. In the course of holding that an ACD did not constitute a favorable termination for purposes of a malicious prosecution claim, the Second Circuit explained in *Singleton* that "[i]f an adjournment in contemplation of dismissal were held to be a result favorable to the defendant for purposes of bringing an action for malicious prosecution, fewer prosecutors would be willing to consent to such adjournments." *Singleton*, 632 F.2d at 194. The same logic applies here, and the Court agrees with Judge Vitiano that, in light of *McDonough* and *Rothstein*, "where, as here, a criminal defendant has traded resolution of his culpability for peace, he may not bring a fair trial claim, the success of which would necessarily undermine the validity of a prosecution settled only by his acceptance of an ACD." *Miller*, 436 F. Supp. 3d at 606; *see also Kayo v. Mertz*, 2021 WL 1226869, at *18 (S.D.N.Y. Mar. 31, 2021) (concluding that "as a matter of law that acceptance of an ACD does not constitute a favorable termination for purposes of a § 1983 fair trial claim").

**D.    Excessive Detention Claim**

Plaintiff's claim for excessive detention sounds in the Fourth Amendment which "requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention" following a warrantless arrest. *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005). Under the Supreme Court's decision in *County of Riverside*, "[j]udicial determinations of probable cause within 48 hours of arrest will, as a general matter, [satisfy the Fourth Amendment]." *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). A plaintiff, however, can allege a Fourth Amendment claim if he "can prove that his or her probable cause determination was delayed unreasonably." *Id*. "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id*. At the same time, "the Fourth Amendment permits a reasonable postponement of a probable cause determination while the police cope with the everyday problems of processing suspects through an overly burdened criminal justice system." *Id*. at 55; *see also id*. ("[T]here will be delays caused by paperwork and logistical problems. Records will have to be reviewed, charging documents drafted, appearance of counsel arranged, and appropriate bail determined."). The Supreme Court thus provided the following examples of delays that are not unreasonable so long as they do not last more than 48 hours: "unavoidable delays in transporting arrested persons from one facility to another, handling late-night bookings where no magistrate is readily available, obtaining the presence of an arresting officer who may be busy  processing other suspects or securing the premises of an arrest, and other practical realities." *Id*. at 57.

No reasonable jury could find that the detention of Plaintiff following his arrest was excessive. *See Caravalho v. City of New York*, 732 F. App'x 18, 24 (2d Cir. 2019) (affirming grant of summary judgment where plaintiffs were detained from 24 to 30 hours before probable

cause hearing). The parties disagree as to the precise moment of Plaintiff's arrest. Plaintiff claims he was not free to leave and therefore was arrested when Officer Grieshaber told him he was not free to leave. Defendants argue that the time for the excessive force claim should start a short while later after Sgt. Burkitt arrived at the scene. In either event, Plaintiff's detention lasted no longer than approximately 18 hours and thus was presumptively reasonable. *See Caravalho*, F. App'x at 24; *Bryant*, 404 F.3d at 137.

Nor has Plaintiff adduced evidence to create a triable issue that his arrest processing was unduly delayed. The record demonstrates that he was arrested at approximately 3:30 p.m. on July 1, 2015. The record further reflects that shortly after his arrest, he was taken to the 100th precinct where he was held for processing for an "hour or two." Dkt. No. 90 ¶ 79; Dkt. No. 102 ¶ 167. The paperwork from Queens Central Booking reflect that at around 8:30 p.m., Police Officers Donmartin Atienza ("Atienza") and Alexis Chavez ("Chavez") transported Reen and Plaintiff to Queens Central Booking from the 100th precinct. Dkt. No. 102 ¶ 176. According to the logbook, Atienza and Chavez arrived at Queens Central Booking with Plaintiff at around 8:50 p.m. Dkt. No. 102 ¶ 179. At Queens Central Booking, he was further processed including for fingerprinting, and a retina scan. Dkt. No. 90 ¶¶ 81-82; Dkt. No. 102 ¶¶ 169-70. Plaintiff's arrest paperwork was ready by 8:33 p.m., and it was faxed to the Queens County District Attorney's Office between 8:35 p.m. and 8:48 p.m. on July 1, 2015. Dkt. No. 102 ¶¶ 180-81. By 9:00 p.m., the Queens County District Attorney's Office "released" the arresting officer, Officer Grieshaber. Dkt. No. 102 ¶ 182. At 9:25 p.m., Plaintiff went through the New York City Criminal Justice Agency interview, and the Queens County District Attorney's Office accepted the arrest paperwork at around 9:30 p.m. *Id.* ¶¶ 183-84. The Queens County Supreme Court clerical staff prepared the compiled paperwork to be distributed to the various agencies involved

in Plaintiff's processing at 9:37 p.m., and at 9:50 p.m., a package concerning the arrest-related paperwork was prepared by the Queens Count Supreme Court clerical staff and physically handed to the court. *Id.* ¶¶ 185-86. Plaintiff's criminal matter was docketed at 10:12 p.m. on July 1, 2015. *Id.* ¶ 187. At around 10:20 p.m., the court was "down," and it was reported that Judge Drysdale had arraigned 43 cases. *Id.* ¶ 188. Plaintiff's criminal attorney did not file a notice of appearance until July 2, 2015 at 9:00 a.m. *Id.* ¶ 189. At around 11:43 a.m., Plaintiff was arraigned and released on his own recognizance. *Id.* ¶ 190.

Plaintiff argues that a genuine factual issue exists because the same unidentified correction officer who told him that he would not be able to see a judge on the night of July 1 had first told him a couple of hours after his arrival at Central Booking that he would be able to see a judge that night. *Id.* ¶ 171; Dkt. No. 106 ¶ 277. He also relies on an entry in a July 1, 2015 NYPD Manhattan Court Section Detention Pen Log that contains special remarks for Plaintiff and Reen alone (and not for the 26 other arrestees on that day) that say "walk through," a term that normally means the NYPD would try to expedite an arrestee's processing as a matter of courtesy and that the arresting officer or an escorting officer would stay with the prisoner the entire time he is at the NYPD Central Booking facility. Dkt. No. 106 ¶¶ 285-87. Plaintiff argues from the undisputed fact that non-party Police Officers Atienza and Chavez did not stay with Plaintiff throughout his time at Central Booking, *see id.* ¶ 289, that "a reasonable jury would not conclude that Plaintiff was "being afforded the expedited arrest processing as a matter of courtesy," but that "a reasonable jury could instead conclude that [Captain] Mahoney sent a message to Central Booking (either directly, or through a subordinate) and told them to slow down Plaintiff's . . . processing to make them stew for an unnecessarily long time before being arraigned, in retaliation for Plaintiff having taking photos of Islam's car in front of the hydrant,

and in retaliation for Plaintiff telling [Captain] Mahoney to go fuck himself, and that that was the ironic meaning of the special designation 'walk through' in the NYPD's Central Booking log in this case." Dkt. No. 104 ¶¶ 56-57.

The flaws in Plaintiff's argument are that the first statement, purportedly from the unidentified correction officer, is hearsay when taken for the truth on this motion for summary judgment, *see Burlington Coat Factory Warehouse Corp. v. Esprit De Corp*., 769 F.2d 919, 924 (2d Cir. 1985) ("A party cannot rely on inadmissible hearsay in opposing a motion for summary judgment."), and the second is based on surmise. There is no evidence that any message was, in fact, sent to Central Booking to slow down Plaintiff's processing. Nor has Plaintiff presented evidence to call into question the objective documentary evidence that demonstrates there was no unreasonable delay in the processing of Plaintiff who was not arrested until the late afternoon of July 1, 2015.

### E. Failure to intervene claim

"A police officer may be liable for failure to intervene under § 1983 where '(a) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.'" *Rodriguez v. City of New York*, 2018 WL 2371719, at *4 (S.D.N.Y. May 24, 2018) (quoting *Jean-Laurent v. Wilkinson*, 540 F. Supp.2d 501, 512 (S.D.N.Y. 2008)).

Plaintiff argues that there are material fact issues requiring trial because "each of the individual defendants at the scene knew—based on Islam's own words and conduct at the scene, and based on Ms. Anderson's report to the officers and Sgt. Burkitt at the scene that Islam had vandalized his own vehicle with a key and tried to pin it on Reen—that Islam was a dishonest and unreliable complainant, and thus had a duty to intervene to prevent Plaintiff's false arrest at

the scene, and there were no time constraints preventing them from doing so." Dkt. No. 104 ¶ 58. He also argues that "all of the individual Defendants were privy to Mahoney's retaliatory actions at the precinct in deciding to formally arrest and book Plaintiff, and to direct that his processing be delayed, and all of them failed to intervene to prevent Mahoney's further violation of Plaintiff's rights." *Id*.

Neither argument demonstrates a genuine issue of material fact. There is evidence, which Defendants dispute, that Anderson—Reen's sister—told Sgt. Burkitt that T.A. Islam vandalized his own vehicle with a key and that he did not record that information or speak with her. Dkt. No. 106 ¶ 307. There is no evidence that any of the other officers spoke to Anderson or were informed as to what Anderson had told Sgt. Burkitt. *See id*. ¶ 308 (Plaintiff's counterstatement of facts: "The police at the scene never asked Ms. Anderson what she saw occur with regard to Plaintiff, Mr. Reen, and T.A. Islam").

"A police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's 'clearly established statutory or constitutional rights' of which a reasonable person would have known." *Ricciuti*, 124 F.3d at 129 (quoting *Harlow v. Fitzgerald*, 457 U.S. at 818). "Further, the failure to intercede must be under circumstances making it objectively unreasonable for him to believe that his fellows officers' conduct did not violate those rights." *Id*. Plaintiff has not established a genuine issue of fact as to Officers Grieshaber, Fransson, or Captain Mahoney. From the information in possession of those officers, T.A. Islam had provided a reliable statement that Plaintiff and Reen had obstructed his vehicle. The officers had no information from which to question that an officer relying on that statement in finding probable cause would be violating clearly established law.

Plaintiff also has not established a genuine issue as to Sgt. Burkitt. In the first instance, Sgt. Burkitt was the arresting officer. He cannot be liable both for false arrest and for failure to intercede to prevent the false arrest. Second, the evidence in front of him neither negated arguable probable cause nor—assuming he was not the arresting officer—gave rise to a duty to intercede. The factual dispute regarding what Anderson told Sgt. Burkitt is not material. Sgt. Burkitt might "have been entitled to believe [Anderson's] version of events rather than [T.A. Islam's] [but] he was not required to do so." *Ricciuti*, 124 F.3d at 128. Nor does the evidence establish that any of the other Defendants were required to intervene and stop Plaintiff's arrest when, as discussed above, the evidence established at the least arguable probable cause for that arrest.

Plaintiff's argument that each of the other defendants was required to intercede at the precinct or at Central Booking and hasten Plaintiff's processing fares no better. Plaintiff was held at the precinct only for an hour or two and did not arrive at Central Booking until approximately 8:30 p.m. There is no evidence to support the allegation that his constitutional rights were violated. Nor is there evidence to support the notions that any of the other defendants were in a position to hasten his processing or would have known that his rights were being violated.

F. **Supervisory Liability**

Plaintiff's second claim for relief alleges: "By their conduct in failing to remedy the wrongs committed by their subordinates and in failing to property train, supervise or discipline their subordinates, supervisory defendants NYPD TRAFFIC SUPERVISOR MOHAMMAD ISLAM, NYPD SERGEANT KEITH BURKITT, NYPAD CAPTAIN DANIEL MAHONEY (retired), NYPD TRAFFIC SUPERVISOR DEBORAH YOUMANS (retired), and RICHARD

ROSES caused damage and injury in violation of plaintiff's rights guaranteed under 42 U.S.C. § 1983 and the United States Constitution."  Dkt. No. 1 ¶ 106.

As pleaded, the second claim fails to state a claim for relief.  *See Tangreti v. Bachmann*, 983 F.3d 609, 615, 618 (2d Cir. 2020).  In *Tangreti*, the Second Circuit held that there is no "special test for supervisory liability [under § 1983]."  *Id.* at 615.  "Rather, 'a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'"  *Id.* (quoting *Iqbal*, 556 U.S. at 676).  In so holding, the Second Circuit repudiated its earlier decision in *Colon v. Coughlin* that "[t]he personal involvement of a supervisory defendant may be shown by evidence that: . . . (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; [or] (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts." 58 F.3d 865, 873 (2d Cir. 1995).  The second claim for relief states no more than that which would suffice under the now-repudiated *Colon* standards.

In response, Plaintiff withdraws his claims based on *Colon*.  He argues, instead, that his claims against Sgt. Burkitt, Captain Mahoney, and Youmans are "not based on their status as supervisors, but based upon their own individual, personal involvement in the constitutional violations complained of . . ."  Dkt. No. 104 at 64.  There is no evidence to create a genuine issue of material fact that Sgt. Burkitt, Captain Mahoney, or Youmans violated Plaintiff's constitutional rights.  Construing the evidence in Plaintiff's favor, Sgt. Burkitt and Captain Mahoney authorized Plaintiff's arrest based on probable cause; Captain Mahoney also was involved in the processing of Plaintiff at the precinct.  Youmans wanted Plaintiff arrested but did not effectuate the arrest and her comments did not cause the arrest.  None of that evidence establishes a violation of constitutional rights.

### G.     Plaintiff's *Monell* Claim

Defendants also move for summary judgment on Plaintiff's *Monell* claim against the City

of New York.  To plead a § 1983 claim against a municipality, such as the City, a plaintiff must

allege: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right;

(3) causation; (4) damages; and (5) that an official policy of the municipality caused the

constitutional injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (citing *Monell v.

Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978)).  In other words, a plaintiff seeking to hold a

municipality liable under § 1983 must prove: "(1) an official policy or custom hat (2) causes the

plaintiff to be subjected to (3) a denial of a constitutional right."  *Rodriguez v. Winski*, 973 F.

Supp. 2d 411, 425 (S.D.N.Y. 2013).  A plaintiff satisfies the "policy or custom" requirement by

alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by
> government officials responsible for establishing the municipal policies that caused
> the particular deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or usage of which a
> supervising policy-maker must have been aware; or (4) a failure by policymakers
> to provide adequate training or supervision to subordinates to such an extent that it
> amounts to deliberate indifference to the rights of those who come into contact with
> the municipal employees.

*Johnson v. Paul*, 2018 WL 2305657, at *3 (S.D.N.Y. May 21, 2018) (quoting *Brandon v. City of

New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

Inaction can rise to the level of a municipal policy "where a local government is faced

with a pattern of misconduct and does nothing, compelling the conclusion that the local

government has acquiesced in or tacitly authorized its subordinates' unlawful actions."  *Reynolds

v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007).

The Complaint alleged that Plaintiff's injury was caused as a result of an official policy

of the NYPD to retaliate against members of the public who observed and recorded the results of

police activity. According to the Complaint, in 1977, the City of New York and its then Police Commissioner entered into a consent decree as a result of the class action in *Black v. Codd*, No. 73-cv-5283, which stated in relevant part that it was the "policy of the New York Police Department . . . that when a person (or persons) is detained, stopped or arrested in public areas, a person or persons not involved in the conduct for which the first person is stopped or arrested may remain in the vicinity of the stop or arrest as an onlooker or onlookers, subject to the safety of the person stopped, the third persons, the general public, and officers of the Police Department." Compl. ¶ 100. The consent decree further stated:

> The following [would not] constitute probable cause for arrest or detention of an onlooker unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated:
>
> (a) Speech alone, even though crude and vulgar;
>
> (b) Requesting and making notes of shield numbers or names of officers;
>
> (c) Taking photographs;
>
> (d) Remaining in the vicinity of the stop or arrest.

*Id*. The Complaint further alleged that:

> In response to numerous complaints by members of the press and the public, and various civil rights organizations, concerning the routine violations of the First Amendment and the consent decree in <u>Black v. Codd</u>, the NYPD's Chief of Department—in, on [sic] information and belief, the summer of 2014—issued a 'FINEST MESSAGE General Administrative Information' which reiterated the written policy (the consistent violation of which has been long-tolerated within the NYPD) of the NYPD to be as follows:
>
> TO: ALL COMMANDS
>
> RE: RECORDING OF POLICE ACTION BY THE PUBLIC
>
> MEMBERS OF THE SERVICE ARE REMINDED THAT MEMBERS OF THE PUBLIC ARE LEGALLY ALLOWED TO RECORD (BY VIDEO, AUDIO, OR PHOTOGRAPHY) POLICE INTERACTIONS. THESE INTERACTIONS INCLUDE ARREST AND OTHER SITUATIONS. MEMBERS OF THE SERVICE WILL NOT INTERFERE WITH A

PERSON'S USE OF RECORDING DEVICES TO RECORD POLICE
INTERACTIONS. INTENTIONAL INTERFERENCE SUCH AS
BLOCKING OR OBSTRUCTING CAMERAS OR ORDERING THE
PERSON TO CEASE CONSTITUTES CENSORSHIP AND ALSO
VIOLATES THE FIRST AMENDMENT.

IT SHOULD BE NOTED, HOWEVER, THAT PERSONS MAY NOT
INTERFERE WITH POLICE OPERATIONS. MEMBERS, IF
APPROPRIATE, SHOULD ADVISE THE PUBLIC NOT TO GET TOO
CLOSE AND MAY TAKE ACTION ONLY IF THE PERSON
INTERFERES WITH THE OPERATION OR THE SAFETY OF THE
MEMBERS OF THE SERVICE OR THE PUBLIC. HOWEVER, MERE
RECORDING OF AN INCIDENT DOES NOT CONSTITUTE
INTERFERENCE. COMMANDING OFFICERS WILL ENSURE THAT
THE CONTENTS OF THIS MESSAGE ARE DISSEMINATED TO ALL
MEMBERS OF THE SERVICE.

*Id.* ¶ 101.

On June 28, 2017, the New York City Civilian Complaint Review Board ("CCRB")

issued a report entitled "Worth A Thousand Words: Examining Officer Interference with

Civilian Recordings of Police." Dkt. No. 100-19; 100-20. The report is a "statistical and

qualitative assessment[ ] of [NYPD] police officers' interference with civilians' ability to record

police activity . . . which draws upon three full years of CCRB complaint data . . ." Dkt. No.

100-20. The report reflects that over the three-year period, "257 complaints—less than two

percent of the 15,006 CCRB complaints closed over three years—included allegations of officer

interference with civilian recordings." *Id.* "Those 257 complaints included 347 allegations that

directly addressed officer interference with civilian recordings of police activity." *Id.*

Twenty-eight percent of the allegations were substantiated; the remainder were either

unsubstantiated, exonerated, or unfounded. *Id.* at 19. The press release announcing the report

states that the "interference included verbal interference like directing civilians to stop recording;

physical interference like knocking a recording device out of a civilian's hands; blocking

recordings like physically obstructing a civilian's camera view of a scene; and intimidation like

threating to arrest or detain a civilian for recording an interaction." Dkt. No. 100-19. It does not refer to actual false arrests. The report contains recommendations including that "the Patrol Guide be updated to include a section with comprehensive guidelines for officers to follow when the encounter a civilian who wants to record police conduct." Dkt. No. 100-20 at 32-34.

Plaintiff's *Monell* claim fails at the threshold. He cannot establish municipal liability against the City because he does not sufficiently allege a constitutional violation. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986) (finding no municipal liability in the absence of a constitutional violation); *Martinez v. City of New York*, 340 F. App'x 700, 702 (2d Cir. 2009) ("A municipality cannot be liable for acts by its employees which are not constitutional violations.") (internal quotation marks and citation omitted). The alleged fact that T.A. Islam was "parked on a hydrant" did not entitle Plaintiff to obstruct him from carrying out his lawful governmental duties nor did Plaintiff's complaints about T.A. Islam's conduct and Plaintiff's desire to photograph T.A. Islam deprive law enforcement of the right to enforce the criminal laws when Plaintiff—in carrying out his First Amendment activities—also obstructed governmental administration.

Plaintiff's proof also fails for failure to present a genuine issue either that the City had a policy, pattern, or practice of interfering with the exercise of First Amendment rights to criticize the police or that he "suffered the denial of a constitutional right that was caused by an official municipal policy or custom." *McGrier v. City of New York*, 2021 WL 716993 (2d Cir. 2021) (quoting *Frost*, 980 F.3d at 257). A plaintiff "may adequately plead the existence of de facto customs or policies based on governmental reports documenting constitutional deficiencies or misconduct." *Felix v. City of New York*, 344 F. Supp. 3d 644, 658 (S.D.N.Y. 2018). Although the fact "[t]hat a report [is] published after the subject incident does not prevent plaintiffs form

relying on it," such reliance will only succeed where "plaintiffs [also] plead other allegations from which the court may infer high-level policymakers' acquiescence" at the time of the constitutional tort in question. *Id.* Here, the CCRB report fails to establish the existence of a predictable pattern or custom of using police force to prevent the exercise of First Amendment activities at the time of the tort in question. The report was not published until well after the incidents in this case and thus could itself not have given the City notice of such practice. *See McGrier*, 2021 WL 716993 at *4. Nor has Plaintiff identified anything in the body of CCRB report or the circumstances of its preparation or publication that would reflect the existence of a "widespread and persistence practice" to which the City acquiesced. *Id.*; *cf. Bektic-Marrero v. Goldberg*, 850 F.Supp. 2d 418, 430–31 (S.D.N.Y. 2012) (municipal policy adequately pled on the basis of a report describing unconstitutional practices and where high-ranking officials had been advised of the report's preliminary filings in advance of the conduct giving rise to plaintiff's claim).

## CONCLUSION

For the reasons stated, the motion for summary judgment is GRANTED. Dkt. No. 89. Accordingly, the motions against Defendant Youmans at Dkt. No. 70 and 81 are denied as moot.

The Clerk of Court is instructed to enter judgment in favor of Defendants and against Plaintiff, and to close the case.


SO ORDERED.

Dated: July 2, 2021                             _____
       New York, New York                              LEWIS J. LIMAN
                                                  United States District Judge